IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBERT ALLEN GATTIS,            )
                                )
        Petitioner,             )
                                )
    v.                          )        Civil Action No. 97-619-RRM
                                )
ROBERT SNYDER, Warden,          )
Delaware Correctional Center,   )
                                )
        Respondent.             )

---

**OPINION**

---

Kevin J. O'Connell, Esquire, Wilmington, Delaware, counsel for Petitioner.

Loren C. Meyers, Esquire, State of Delaware Department of Justice, Wilmington, Delaware, counsel for Respondent.

---

Dated: March 25, 1999



McKELVIE, District Judge

This is a habeas corpus case. Petitioner, Robert Allen Gattis, is a state prisoner incarcerated at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Respondent, Robert Snyder, is the warden of the DCC. Gattis is contesting the constitutionality of his murder conviction and his death sentence.

On September 22, 1992, a jury in the New Castle County Superior Court of the State of Delaware convicted Gattis of first degree murder, first degree burglary, possession of a deadly weapon by a person prohibited, and two counts of possession of a deadly weapon during the commission of a felony for the murder of Shirley Y. Slay. During the penalty phase of his trial, the jury found by a ten to two vote that the aggravating circumstances of his crime outweighed the mitigating circumstances. On October 29, 1992, Judge Norman A. Barron of the Superior Court sentenced Gattis to death by lethal injection. State v. Gattis, 1992 WL 358030, Del. Super. Cr.A. No. IN90-05-1017 through 1019, and 1106 through 1107, Barron, J. (Oct. 29, 1992).

The Delaware Supreme Court affirmed Gattis's convictions and sentence on direct appeal. See Gattis v. State, 637 A.2d 808, 823 (Del. 1994). Gattis subsequently filed a petition for writ of certiorari to the United States Supreme Court, which it denied. Gattis v. Delaware, 513 U.S. 843 (1994).

On October 21, 1994, Judge Barron set an execution date of December 2, 1994. On November 21, 1994, Gattis filed a pro se motion for post-conviction relief. On the same day, Judge Barron entered an order staying the scheduled execution and setting a schedule for filing an amended motion for post-conviction relief.

On February 8, 1995, Gattis filed an amended motion for post-conviction relief. On August 24, 1995, Judge Barron denied Gattis's post-conviction relief motions and rescheduled his execution. See State v. Gattis, 1995 WL 562254, Del. Super. Cr.A. No. IN90-05-1017 through 1018; 1106; 1019-R2; and 1107-R2, Barron, J. (Aug. 24, 1995).

Gattis filed a motion to reargue, which Judge Barron granted in part and denied in part. On October 20, 1995, Judge Barron conducted a hearing on whether Gattis received ineffective assistance of counsel at trial, and then denied Gattis's motion for post-conviction relief. State v. Gattis, 1995 WL 790961, Del. Super., Cr.A. No. IN90-05-1017 to 1019-R2; IN90-05-1106; 1107-R2, Barron, J. (Dec. 28, 1995). Judge Barron rescheduled Gattis's execution for March 29, 1996.

Gattis filed an appeal with the Delaware Supreme Court. The Court heard oral argument and remanded the matter to Judge Barron to make factual findings and conclusions of law on two issues: (1) whether the state's theory of the homicide was impossible; and (2) whether the state improperly excluded a potential juror for gender-related reasons. Gattis v. State, Del. Supr. No. 37, 1996, Holland, J. (October 15, 1996). On December 11, 1996, Judge Barron denied Gattis's motion for post-conviction relief on the second issue. See State v. Gattis, 1996 WL 769328, Del. Super. No. 90004576DI, Barron J. (Dec. 11, 1996). On December 17, 1996, Judge Barron held an evidentiary hearing on on the first issue, and denied Gattis's motion for post-conviction relief. See State v. Gattis, 1997 WL 127007, Del. Super. No. 90004576DI, Barron, J. (Feb. 13, 1997). Gattis appealed this decision to the Delaware Supreme Court, which affirmed Judge Barron's decisions to deny post-conviction relief. Gattis v. State, 697 A.2d 1174 (Del. 1997), as revised on denial of rehearing (Sept. 8, 1997) cert. denied, -- U.S. --, 118 S. Ct. 1070 (1998). On

2

September 19, 1997, Judge Barron rescheduled Gattis's execution for January 9, 1998.

On November 25, 1997, Gattis filed a petition for writ of habeas corpus in this court, alleging constitutional infirmities in his trial and post-conviction appeals. Gattis alleges he received ineffective assistance of counsel at trial because his counsel failed to adequately prepare for trial and investigate his version of events; delays leading up to trial denied him the right to a speedy trial; the prosecution failed to divulge relevant evidence before and during trial; the prosecution improperly used a peremptory challenge to remove a potential juror based on gender; the court did not use random means to select a jury; the court improperly failed to permit expansion of the record on post-conviction claims; and the court improperly affirmed his conviction and death sentence on post-conviction review based upon a theory of the crime not originally presented at trial. The following is the court's decision on Gattis's petition for a writ of habeas corpus.

I.    FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the following sources: the Superior Court's penalty hearing findings, State v. Gattis, 1992 WL 358030, Del. Super. No. Cr.A. No. IN90-05-1017 through 1019; 1106 through 1107, Barron, J. (Oct. 29, 1992); [hereinafter Gattis I]; the Delaware Supreme Court's findings in its decision on Gattis's direct appeal in 1994, Gattis v. State, 637 A.2d 808 (Del. 1994) [hereinafter Gattis II]; the Superior Court's findings in its decisions denying Gattis's motions for post-conviction relief, State v. Gattis, 1995 WL 790961, Del. Super., Cr.A. No. IN90-05-1017 to 1019-R2; IN90-05-1106; 1107-R2, Barron, J. (Dec. 28, 1995) [hereinafter Gattis III]; the Delaware Supreme Court's decision affirming the Superior

3

Court's denial of Gattis's motions for post-conviction relief, <u>Gattis v. State</u>, 697 A.2d 1174 (Del.

1997) [hereinafter Gattis IV]; and this court's independent review of the state court proceedings'

record.

      A.    <u>Gattis's shooting of Slay</u>

      Robert Allen Gattis and Shirley Y. Slay began a relationship in 1984. Gattis physically

and emotionally abused Slay during the course of their relationship. Gattis repeatedly accused

Slay of infidelity, punched and slapped her, and threatened her with a gun and a knife.

      Gattis and Slay lived together from time to time, both in apartments rented by Slay, and

at Slay's parent's house. In the months before her death, Slay lived in an apartment in

Wilmington, to which Gattis had a key. In April of 1990, Slay moved into a second floor

apartment in the DuPont Parkway Apartments in New Castle. She did not give Gattis a key to

her new apartment. Slay planned to have her eleven-year old daughter, Tykisha Slay, who lived

with Slay's parents, move in with her before school started that fall. Slay told her friend and

neighbor, Lisa Watson, and her work supervisor, Ruth Ann Noel McCory, that she wanted to end

her relationship with Gattis before Tykisha moved in with her. Around this time, Gattis began

spending several nights a week at the home of another girlfriend, Wanda Scrivens.

      On the night of May 8, 1990, Gattis telephoned Slay at her apartment, but there was no

answer. On May 9, 1990, Slay told her supervisor, McCory that she intended to end her

relationship with Gattis that day. After work on the same day, Slay went to a softball game in

Wilmington with Watson. Slay left the game with Gattis, who arrived separately looking for

Slay. Gattis accused Slay of having another man in her apartment. They drove to Slay's

apartment. There, they argued over Gattis's inability to reach Slay by telephone the previous

day. Slay told Gattis her telephone was broken. Gattis then arranged for a friend, Roosevelt Wright, to call Slay's apartment. When the telephone rang, Gattis became enraged and beat Slay, accusing her of seeing another man. Gattis then left.

Slay called 911 at around 10:45 p.m. to report the assault. Watson arrived at Slay's apartment at this time. Patrolman John Gahan arrived at 11:10 p.m. in response to Slay's 911 report. Slay told Gahan that Gattis had accused her of having a man in her apartment the night before, and punched her in the head four times. Gattis called Slay's apartment several times while Gahan took Slay's report of the incident. Gahan spoke with Gattis on the telephone and told him to have no contact with Slay.

Gattis borrowed Wright's car, and then drove back to Slay's apartment building with a loaded .38 caliber gun. Around midnight on May 10, 1990, Slay telephoned Watson, who lived downstairs from Slay, and asked her to check outside to see if Gattis had returned, because she heard some noise outside her apartment. Watson stepped out of her apartment, and saw Gattis standing outside the entryway to the building. Watson urged Gattis to stop fighting with Slay. Gattis asked if Slay was in, and then headed up the flight of stairs to Slay's apartment.

Watson walked back to her apartment, locked the door, and returned to the phone to warn Slay that Gattis was on his way up to her apartment. Watson hung up the phone, called Slay's parents, and then called Slay back. While on the phone with Slay, Watson heard Slay telling Gattis to go away and that she was not going to open the door. Watson then heard Gattis kicking in Slay's door. Watson and her boyfriend, Frank Gillette, ran out of her apartment and up the stairs to Slay's apartment. Watson's and Slay's apartments were separated by two flights of stairs. While running up the first set of stairs, which faced the entrance to the apartment

5

building, Watson heard a gunshot and saw a flash reflected in the glass around the door. Watson then saw Gattis leap over the second floor landing and run out of the building.

Gattis had kicked in Slay's door and then shot Slay directly between the eyes. Slay died of the bullet wound shortly thereafter.

Watson found the door panel and door jamb broken and the door partially open. Slay's body lay just inside the entry to her apartment, with her feet closest to the door. When Watson pushed the door to Slay's apartment, it opened eight to twelve inches before hitting Slay's feet. Gillette, who entered next, pushed the door against Slay's body to open the door further. Paramedics, who arrived next, removed the door to gain entry into the apartment.

After running out of the apartment building, Gattis drove back to Wilmington. While driving, he threw the gun out of the car window along Route 9. The gun was never recovered in the crime investigation. Gattis went to Wanda Scrivens's house, where he joined the sleeping Scrivens in her bed. That afternoon, on May 10, 1990, Gattis, accompanied by Scrivens and his friend, Lee Simpson, turned himself into the police at the Delaware State Hospital.

B.    Preparation for Gattis's Trial

On May 23, 1990, the Grand Jury charged Gattis with first degree murder, first degree burglary, possession of a deadly weapon by a person prohibited and two counts of possession of a deadly weapon during commission of a felony. Following his arrest, Gattis was represented by the Office of Public Defender. On May 30, 1990, the Office of the Public Defender assigned assistant public defenders Richard M. Baumeister, Esquire, and John H. McDonald, Esquire, to represent Gattis.

Baumeister contacted Elizabeth Dewson, the Public Defender's Office's psycho-forensic

6

evaluator. Upon Baumeister's direction, Dewson taped an interview with Gattis. In the

interview, Gattis told Dewson his gun accidentally discharged while he forced his way into

Slay's apartment. Gattis told Dewson that he could see part of Slay's head behind her door, and

that Slay was standing behind the door when his gun discharged, and that she turned, and then

fell. Gattis also told Dewson he heard Slay say "Oh God" when he ran out of the building.

At Baumeister's request, Dr. Cono Galliani, Ph.D, performed a psychological evaluation

of Gattis. Gattis told Galliani that he thought another man was in Slay's apartment at the time of

the shooting. Gattis also told Galliani, he heard Slay say "Oh God" after the gun discharged.

Joseph Slights is an attorney who worked for the Law Offices of Sidney Balick at this

time. Slights interviewed Gattis after Sidney Balick was approached by someone seeking legal

representation on behalf of Gattis. During this interview, Gattis told Slights that he was trying

to force entry into Slay's apartment when his gun accidentally discharged. Gattis said he heard

Slay speak after the gun discharged. Gattis also told Slights that he thought a man was in Slay's

apartment at this time.

The Superior Court initially set a trial date of November 1, 1990, but granted a

postponement requested by Gattis's counsel, so that Gattis could be examined by a neurologist.

The court set a new trial date of March 11, 1991, but granted another postponement, so that

additional medical tests could be conducted upon Gattis. The court set a new trial date of May

20, 1991. The state sought a postponement in a March 11, 1991 letter. On May 29, 1991, Judge

Charles H. Toliver, IV, held a hearing to determine whether the court should grant another

postponement request. Judge Toliver referred to a May 28, 1991 letter from Baumeister.

According to Judge Toliver, the letter "indicate[d] the defendant did not object to the requested

7

rescheduling because the defendant's ongoing psychological and neurological examinations were not complete and [would] not be complete until July or August." At the hearing, Gattis expressed concern about the delays, but agreed to postpone trial until November 26, 1991, to give his counsel time to prepare the case.

On November 4, 1991, the Delaware's governor, Michael Castle, signed Senate Substitute 1 for Senate Bill 79, amending 11 Del. C. § 4209, relating to the imposition of the death penalty. The terms of the amended law apply to all defendants tried or sentenced after its effective date. According to the amended law, the jury, at the penalty phase, makes a death sentence recommendation to the court by answering the following questions:

> 1. Whether the evidence shows beyond a reasonable doubt the existence of at least 1 aggravating circumstance as enumerated in subsection (e) of this section; and
>
> 2. Whether, by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bear upon the particular circumstances or details of the commission of the offenses and the character and propensities of the offender, the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist.

11 Del. C. § 4209(c)(3)a.1-2. The court is not bound by the jury's recommendation.

Section 4209, as amended, requires the judge to impose a death sentence after considering the recommendation of the jury, if the judge finds:

> a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and
>
> b. By a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the court to exist outweigh the mitigation circumstances found by the court to exist.

11 Del. C. § 4209(d)(1)a-b.

8

Pursuant to the previous version of 11 Del. C. § 4209 in existence before November 4, 1991, the jury had to unanimously recommend the death penalty for a defendant to receive that sentence.

Pursuant to Delaware Supreme Court Rule 41, the Superior Court certified questions of law to the Delaware Supreme Court, on whether the new death penalty statute violated the U.S. Constitution or the Delaware Constitution. See State v. Cohen, 604 A.2d 846 (Del. 1992). Defendants awaiting trial for first-degree murder who allegedly committed murders before the new law became effective, including Gattis, participated in the certification process. See State v. Cohen, 604 A.2d 846 (Del. 1992).

In a November 13, 1991 Administrative Directive, the Superior Court postponed all trials and penalty hearings in capital first-degree murder cases, including Gattis's trial, while the Delaware Supreme Court considered the certified questions of law. See Administrative Directive of the Presiding Judge of the Superior Court of the State of Delaware No. 91-2, Nov. 13, 1991, revised Nov. 20, 1991.

On January 28, 1992, the Office of the Public Defender moved for leave to withdraw as counsel and requested that conflict counsel be appointed, citing a conflict of interest. The court granted the motion. On February 3, 1992, Howard F. Hillis, Esquire, was appointed to represent Gattis, but soon thereafter, Hillis withdrew from the case due to health problems.

On February 14, 1992, the Delaware Supreme Court answered the certified questions of law, by finding § 4209, as amended, did not violate the U.S. Constitution or the Delaware Constitution. See State v. Cohen, 604 A.2d 846 (Del. 1992). In a February 18, 1992 Administrative Directive, the Superior Court rescinded the temporary stay of all trials and

9

penalty hearings in capital first-degree murder cases. <u>See</u> Administrative Directive of the Presiding Judge of the Superior Court of the State of Delaware No. 92-2, Feb. 18, 1992 (rescinding Administrative Directive 91-2).

On March 5, 1992, Jerome M. Capone, Esquire, was appointed to represent Gattis. Capone met with Gattis approximately six times prior to trial. Capone visited Slay's apartment building prior to trial, but did not enter her apartment. He attempted to speak with Watson, but she refused to discuss the case with him. Capone reviewed the physical evidence held at police headquarters.

On March 10, 1992, the Superior Court scheduled trial to commence on September 9, 1992. On March 30, 1992, the court appointed Joseph M. Bernstein, Esquire as co-counsel to Gattis.

On April 23, 1992, the court granted Gattis's motion for authorization to pay for psychological and psychiatric evaluation. Gattis's counsel retained Robert L. Sadoff, M.D. to provide a psychological and psychiatric evaluation of Gattis.

C.    <u>Trial</u>

1.    <u>Jury Selection</u>

Trial commenced on September 1, 1992, presided over by Judge Barron. Capone and Bernstein represented Gattis. Mark W. Bunitsky and Marsha J. Epstein represented the State of Delaware.

The Superior Court summoned approximately 400 people from the jury pool. Among the 400 people, 40 were Black and 4 were of Hispanic origin. On the morning of September 1, 1992, the jury manager assembled the prospective juror panels on a "first-come, first-served" basis.

10

This entailed assigning sequential numbers to the first 150 potential jurors as they arrived at the courthouse on the first morning of trial. Once court convened, Judge Barron collectively asked the array preliminary questions, and then called the prospective jurors in sequential order in groups of twenty for individual voir dire. The court subjected ninety-nine jurors in all to individual voir dire, including ten Black jurors and four Hispanic jurors.

The first thirty-five prospective jurors called for individual voir dire were Caucasian. Gattis is Black. Gattis's counsel inquired into the method for assembling the jury panels because they were concerned about racial bias. After finding out the jury manager had assembled the jury on a "first-come, first-served" basis, counsel moved to stay or dismiss the jury panel, alleging jury selection had not complied with procedures mandated by the Delaware Jury Selection and Service Act, 10 Del.C. § 4501. Section 4501 requires jurors be "selected at random from a fair cross section of the population . . . ." 10 Del. C. § 4501. Gattis's counsel argued the "first-come, first-served" jury selection method is not random, because prospective jurors might "segregat[e] themselves" into groups as they walked in and mingled before getting a number. Counsel also argued that the "distribution of blacks throughout the first forty and first one hundred is not consistent with a showing of random selection."

On September 8, 1992, Judge Barron held a hearing on defendant's motion. Mark Vavala, the Superior Court jury manager, testified about the method used to assign numbers to jurors. Defendant presented expert testimony of Dr. Barry Morstain, Ph.D. Morstain testified that the "first-come, first-served" method is not random because human nature and external factors may impact the order in which people arrive.

Judge Barron denied Gattis's motion to dismiss the panel, finding there was no conscious

11

effort to exclude Black prospective jurors. Judge Barron noted that 10% of the 99 jurors participating in individual voir dire were Black, which was the same as the percentage of Black jurors in the initial group of 400. Of the remaining 64 potential jurors, 10 were Black. Judge Barron deemed the racial composition of the first 35 jurors "irrelevant," because the racial percentage of the entire voir dire represented the entire jury assembly.

During jury selection, the state used one of its peremptory challenges to strike Wilfred Moore from the panel. After the court excused Moore, Bunitsky offered two reasons on the record for using his peremptory challenge:

> Number one, I believe that this juror was very, very conservative in his application of the possible application of the death penalty. He answered very quickly yes to the possibility of imposing a life sentence under the appropriate facts and circumstances, yet, to our belief, had a very difficult time in answering whether or not he could impose the death penalty under the appropriate circumstances. He seemed to be very, very conservative in the application of the death penalty.
> Number two, he is an older gentleman and we have, I believe, four or five older gentlemen on the jury panel already. And I would suggest that it's the State's point of view that we would prefer to have some more women on the jury.

Judge Barron then made the following statement: "I would just observe again for the record that in light of his responses, it's not surprising at all that the state utilized a challenge, and I'm convinced beyond any doubt whatsoever that challenge was not predicated upon racial motives."

When Moore was struck from the jury, four men and three women had already been selected and the state had used peremptory challenges to remove two women and two men. After Moore was removed, the state used peremptory challenges to remove three women and two men. Also, four jurors who were unable to impose the death penalty were struck for cause on the state's motion. Ultimately, six men and six women were selected for the jury. Four alternate

jurors were also selected, including three women and one man.

      2.    <u>Presentation of Evidence</u>

Opening arguments began on September 9, 1992. During the trial, the prosecution presented evidence that Gattis was obsessively jealous and possessive of Slay, and that he had abused and terrorized Slay for years. The prosecution presented evidence that Slay had sought to break away from Gattis once and for all in the weeks leading up to her murder, and that Gattis murdered her as a means of controlling her. The prosecution presented evidence that on May 10, 1990, just after 12:00 a.m., Gattis kicked down Slay's door, pointed a .38 caliber gun at her face and fired, murdering Slay "execution-style."

The prosecution introduced testimony by Tykisha Slay, Slay's daughter, Shirley E. Slay, Slay's mother, and Ruth Ann Noel McCory, Slay's supervisor, that Gattis had a history of violence against Slay, and that Slay was trying to end her relationship with Gattis when she moved to the DuPont Parkway Apartments.

The prosecution offered testimony by neighbors, friends and police officers about the events leading up to the shooting and the condition of the crime scene.

John Gahan, New Castle County police officer, testified that he responded at approximately 11:10 p.m. to a domestic disturbance at Slay's apartment. Gahan testified that Slay filed a crime report, and told him that she and Gattis had a verbal argument in which he accused her of having someone in her apartment the previous night, and then punched her in the head four times. He testified that Gattis called the apartment approximately three times while he was there, and that he spoke to Gattis one time. He testified that he told Gattis not to come back to Slay's apartment.

13

Lisa Watson testified to her recollection of the events leading up to and including Slay's death and the discovery of her body.  Watson testified that she was the first to enter Slay's apartment after the shooting, and that Slay's door only opened eight to twelve inches before hitting Slay's feet.  On cross examination, Capone questioned Watson further about the position of Slay's body in the entryway to her apartment, and how far Slay's door opened before hitting Slay's feet.  Capone sought to establish that Slay's door would not open far enough to permit Gattis to enter the apartment and then exit after shooting Slay.

Frank Gillette testified about the events leading up to Slay's death.  Gillette testified that Slay's feet were pushed up against the door, and that he had to push the door against her body to enter her apartment.  On cross examination, Capone introduced Gillette's statement to the police after the shooting that he heard two loud bangs followed by a gunshot, and only then did he and Watson run out of her apartment.  Capone introduce this statement to prove less time passed between when Gattis kicked in Slay's door and when Gattis shot Slay than Watson and Gillette had alleged.  Capone asked Gillette more questions about the position of Slay's fallen body and whether it blocked the entrance to her apartment.

The prosecution called Deputy Chief Medical Examiner Galicano Inguito, M.D.  Inguito had performed the autopsy on Slay's body.  He offered forensic testimony concerning the facts and circumstances surrounding Slay's death.

Inguito testified that Slay died from wounds from a .38 caliber bullet shot through the bridge of her nose.  He testified that Slay was incapacitated at the time she was shot, and probably fell where she stood.  He testified that the bullet's path through Slay's head and the abrasion pattern indicated the bullet had a trajectory from Slay's left to right and upward.  He

14

testified that the stippling around Slay's entry wound indicated that the muzzle of the gun was four to eighteen inches from her head when Gattis shot her.

Inguito testified that Slay's wounds were consistent with the prosecution's theory that Gattis shot Slay with his right hand as he faced her from four inches away.  On cross examination, Inguito expressed the opinion that Slay's wounds were also consistent with a scenario in which Gattis accidentally shot Slay as he reached around her door with his right hand while holding a cocked gun.  On redirect examination, Inguito expressed the opinion that the prosecution's theory was more likely in light of Slay's wounds.

The defense called Clyde Spinelli, manager of the DuPont Parkway Apartments.  Spinelli testified that there is a closet in the entry hall of Slay's apartment, and that when the front door is open twelve inches, there is only a six and one half inches opening between the door and the closet's edge.  Spinelli testified that diagrams prepared by Capone depicting the entryway to Slay's apartment were accurate.

Gattis testified in his own defense about his relationship with Slay, his history of jealousy and physical abuse, and the events leading up to and including Slay's death.  Gattis testified that he had previously drawn a gun on Slay in 1987 when he saw her talking to a man, William German, at an American Legion Post while she tended bar.  Gattis testified that he was at the bar and he saw German there.  Gattis testified that he thought Slay had dated German and that he believed Slay was being unfaithful to him.  Gattis testified that he left the bar, retrieved a gun, and returned to the bar.  Gattis testified that he hit German with the pistol, and then they wrestled.  Gattis testified that while scuffling with German, the gun "went off I think maybe three times . . . ."  Gattis testified that he pointed the gun at Slay after fighting with German, and

then left the bar. Gattis testified that he pleaded guilty to charges of reckless endangering and assault in connection with this incident.

Gattis offered his account of the incident leading to Slay's death. He testified that he shot Slay accidentally as he pushed his way into Slay's apartment. Gattis testified that he took a gun to Slay's apartment because he thought Slay had a male visitor there. Gattis testified that Slay would not open the door, so he kicked the door twice, causing it to swing open. Gattis testified that he grabbed his gun from his pants pocket with his right hand, cocked the gun's hammer, and reached up and grabbed the open door, pushing his right hand into Slay's apartment. Gattis testified that the gun then went off accidentally while he pushed the door open. Gattis testified that he saw Slay falling inside her apartment and heard her say "Oh, God."

Capone asked Gattis whether he meant to pull the gun's trigger. Gattis testified that he did not, and that he had cocked the gun's hammer when he pulled it out of his pants. When asked whether he intentionally cocked the gun's hammer, Gattis stated: "It was more out of habit. I used to sit with the jacket on and had a pistol in my pocket, and I would pull the hammer back and pull the trigger, and--because I didn't pull the trigger to have the gun go off, you know. It just--I just didn't feel like I pulled the trigger." On cross examination, Gattis stated he that would "pull the [gun's] hammer back and pull the trigger and ease the hammer back up into the closed position" as a matter of habit.

On cross examination, Bunitsky questioned Gattis about his prior convictions resulting from the American Legion incident. Bunitsky asked Gattis whether he fired a bullet into the floor at Slay's feet after pointing his gun at her face at the American Legion. Gattis denied he did this.

16

After the defense rested, the prosecution called on rebuttal Jerry Custis, a Wilmington police officer. Custis testified that he investigated the 1987 incident at the American Legion. Custis testified that he observed two bullet holes in the American Legion's bar area, one behind the bar in the floor, where Gattis testified Slay stood, and the other on the back of the bar in a wall just above head level, where Gattis testified he fought with German.

The prosecution also recalled McCory to testify that Slay had told McCory that she feared Gattis, and that Slay had told her that Gattis had threatened to shoot Slay if she broke up with him.

During closing arguments the prosecution argued that Gattis, in a jealous rage, kicked in Slay's door, entered her apartment, pointed his gun at her and then shot her at close range between the eyes. Gattis's accidental shooting story, the prosecution argued, did not fit with the evidence that at least ten seconds passed between when Gattis kicked down Slay's door and fired his gun.

The defense argued in closing that the prosecution's theory that Gattis kicked in Slay's door, entered into her apartment and shot her was impossible in light of the physical evidence that Slay's body blocked the apartment door from opening more than twelve to eighteen inches.

In its reply, the prosecution argued that Gattis "acted intentionally in the form of an execution-style slaying . . . . whether he put his foot between the door and fired the gun in her face or whether he knocked her down and walked over to her and pumped the bullet in her as she's laying on the ground." The prosecution argued "[t]he door was opened enough for [Gattis] to have seen [Slay] and discharged the gun into her face."

The prosecution argued that Gattis had previously pointed a gun at Slay in public at the

17

American Legion, and had intentionally "pumped a shot into the floor" in front of Slay. The prosecution argued that this prior act demonstrated Gattis's motive to assault Slay when he became jealous.

On September 22, 1992, the jury returned with a verdict that Gattis was guilty of first degree murder, first degree burglary, possession of a deadly weapon by a person prohibited, and two counts of possession of a deadly weapon during the commission of a felony.

### 3.    Penalty Hearing

From September 24, 1992 to October 1, 1992, Judge Barron conducted a capital murder penalty hearing pursuant to 11 Del. C. § 4209(h). The state relied on the existence of two statutory aggravating circumstances: (1) "The murder was committed while the defendant was engaged in the commission of . . . any degree of . . . burglary[,]" 11 Del. C.§ 4209(e)(1)j; and (2) "The defendant was previously convicted of . . . a felony involving the use of, or threat of, force or violence upon another person[,]" 11 Del. C. § 4209(e)(1)i.

The state also offered evidence regarding non-statutory aggravating circumstances including: (1) the circumstances and details surrounding the commission of the offense including Gattis and Slay's relationship; (2) Gattis's propensity towards violence or threats of violence; (3) the impact of the crime upon the victim's family and friends, including her daughter, Tykisha Slay ; (4) Gattis's lack of respect for authority; and (5) Gattis's conduct while on court supervision.

Gattis offered evidence regarding the following mitigating circumstances including: (1) Dr. Robert Sadoff's diagnosis that Gattis has Intermittent Explosive Disorder and Episodic Discontrol Syndrome; (2) Gattis's obsessive and possessive relationship with Slay; (3) Gattis's

18

early years of neglect and abuse and exposure to domestic violence; (4) Gattis's alcohol abuse; (5) Gattis's prior good deeds and acts; and (7) Gattis's remorse.

During the penalty hearing, Lieutenant Donald Roberts of the Wilmington Police Department testified for the prosecution. Roberts investigated the 1987 American Legion incident. Roberts testified that, during a formal interview following the incident, Slay said that Gattis pointed the gun at her head and then lowered it and shot into the floor. Roberts testified that Slay, however, became uncooperative and refused to make that assertion in her formal typed police statement. Roberts testified that in the typed statement, Slay said "Me and Robert, we went to Post and had lunch and he left. He came back and all hell broke loose." Roberts testified Slay said "Him and Bill got into an argument. I heard one bullet go off and I hollered, 'Rob,' and I called the cops." The state offered this testimony to demonstrate that Slay had a pattern of protecting Gattis after he acted with violence towards her.

Following deliberations, the jury unanimously found the state proved beyond a reasonable doubt the existence of both statutory aggravating circumstances. Ten out of twelve jurors also found, by a preponderance of the evidence, that the aggravating circumstances outweighed the mitigating circumstances. Gattis I at *2.

Because Delaware's newly-amended death penalty statute applied to Gattis's penalty hearing, the judge was not bound by the jury's recommendation, and had the authority to impose the sentence he deemed appropriate after independently weighing the aggravating and mitigating factors. See 11 Del. C. § 4209. Based upon his review of the jury's recommendation and additional argument from both sides, Judge Barron independently determined that the state established beyond a reasonable doubt the existence of two statutory aggravating circumstances,

19

Gattis I at *3, and that the aggravating circumstances outweighed the mitigating circumstances, id. at *13-14. According to Judge Barron, "After balancing all of the circumstances, both aggravating and mitigating, mercy is not warranted in this case." Id. at *14. On October 29, 1992, Judge Barron ordered Gattis be executed by lethal injection.

D.    Post-conviction Proceedings

1.    Direct Appeal

Gattis appealed the convictions and sentence to the Delaware Supreme Court. In his appeal, Gattis asserted various claims of error relating to the admissibility of evidence in both the guilt and penalty phase of his trial. Gattis argued that the imposition of the death sentence was not proportionate to the offense committed. He also argued that the jury for his trial was not randomly selected.

In his appeal, Gattis alleged there were causes for Tykisha Slay's emotional condition other than her mother's death. The Delaware Supreme Court remanded the case to the Superior Court to conduct an evidentiary hearing on whether Tykisha's emotional state was attributable to causes other than her mother's death. Gattis v. State, Del Supr. Nos. 498 and 514, 1992, Walsh, J. (Mar. 16, 1993) (ORDER). After holding a hearing, Judge Barron determined the evidence presented did not require the court to amend its previous findings after the penalty hearing, nor to grant any other relief. See Gattis v. State, Del. Super., Cr.A. Nos. IN90-05-1017 to 1019, IN90-05-1106 & 1107, Barron, J. (May 10, 1993) (Findings After Remand).

On February 28, 1994, the Delaware Supreme Court affirmed both the convictions and the sentence imposed. Gattis II. Gattis filed a writ of certiorari to the United States Supreme Court, which denied certiorari on October 3, 1994. Gattis v. Delaware, 513 U.S. 843 (1994). On

20

October 21, 1994, Judge Barron set a new execution date of December 2, 1994, and appointed

Kevin J. O'Connell, Esquire and Anthony A. Figiola, Jr., Esquire to represent Gattis in his post-

conviction proceedings.

    2.  Post-conviction Appeal

  On November 21, 1994, Gattis filed a pro se motion for post-conviction relief.  On

February 7, 1995, Gattis filed a motion to expand the record and a motion for leave to conduct an

evidentiary hearing.  On February 8, 1995, Gattis filed an amended motion for post-conviction

relief.

  On February 16, 1995, Gattis moved for leave to conduct discovery, seeking an order that

the state produce a crime scene video and still photographs taken by New Castle County Police

investigators.  Gattis also requested the court grant funds to obtain a crime scene expert to

recreate the circumstances of Slay's death and to assess the feasibility of Gattis's defense that he

shot Slay accidentally while pushing open her door with his gun in his hand.  This was to provide

support for his contentions that his counsel failed to adequately prepare for trial.  Gattis requested

the court hold a hearing on the issue of the circumstances of Slay's death.

  On March 31, 1995, Judge Barron granted Gattis's request that the state produce a crime

scene video tape and photographs in its possession.  Judge Barron also granted Gattis's

application for funds to hire a crime scene specialist to recreate Slay's murder scene and to assess

Gattis's defense that he shot Slay accidentally.  Gattis used the funds to hire Stuart H. James, a

forensic expert.

  On July 11, 1995, James issued a report to the court.  In his report, James concluded to a

reasonable degree of scientific certainty that Slay was shot while standing in the doorway of her

apartment with her telephone close to her nose and mouth, and that she fell shortly thereafter. James concluded he could not ascertain Gattis's or Slay's exact positions at the time of the shooting based upon the available physical evidence. In his report, James stated "I cannot determine with any scientific certainty whether the shooter fired the fatal shot while facing the victim or while pushing on the door with his right hand holding the weapon around the door." After reading James's report, Judge Barron concluded a hearing was not necessary, because James could not determine with any scientific certainty how Slay was shot.

In his post-conviction motions, Gattis alleged he received ineffective assistance of counsel. On July 19, 1995, pursuant to Superior Court Criminal Rule 61(g)(2), Judge Barron directed Capone and Bernstein to prepare affidavits detailing their trial preparation, performance and strategy.

Bernstein stated in his affidavit that he met with Gattis for the first time on August 5, 1992, and Gattis told him that someone else shot Slay. Bernstein stated he met with Gattis again on September 12, 1992, during trial. Bernstein stated he and Capone told Gattis at this meeting "that from the testimony of the paramedic and Lisa Watson, it would have been virtually impossible for him to have seen the victim prior to the shooting because the victim was directly behind the door." According to Bernstein, Gattis then stated for the first time "that he had been holding the gun in his right hand and, at the same time, pushing with his right hand against the edge of the door, trying to force it open. Gattis also said he did not really see the victim when she was shot."

Bernstein stated that he and Capone decided to develop evidence that would provide a factual basis for the accidental shooting theory by cross-examining Inguito, the deputy medical

22

examiner, obtaining measurements of Slay's apartment, and presenting the apartment complex's

maintenance man's testimony about the layout of the apartment.   Bernstein stated he and Capone

decided not to obtain a forensic expert to reconstruct the shooting, "because we felt the facts to

support an accidental shooting defense had been developed sufficiently, and especially from the

state's own witnesses, to allow us to credibly make an accidental shooting argument to the jury."

In his answer to Bernstein's affidavit, Gattis denied that he told Bernstein that Slay was

shot "by some unknown person who was inside the apartment."  According to Gattis "I

consistently told all my attorneys how the shooting occurred."

Capone stated in his affidavit that Gattis maintained "well into the trial" that "some

unknown boyfriend . . .  whom Gattis apparently imagined was in the apartment" shot Slay.

Capone stated it was well into trial before "Gattis began to recall that he really didn't see the

victim at the time she was shot, and that he was holding the gun in his right hand and he tried to

force his way into the apartment while holding the edge of the door with his right hand."

Capone stated that prior to trial, he "viewed the physical evidence at the New Castle

County Police headquarters," "visited the crime scene and interviewed neighbors[,]" and "met

with Lisa Watson and attempted to interview her . . . ."

Capone stated he returned to the crime scene "[a]t the point in the trial when it began to

appear that we had the basis to present the defense of an accidental shooting," and obtained the

assistance of the apartment complex's maintenance man to take measurements of Slay's

apartment.  Capone stated he subpoenaed "the maintenance man," Spinelli, who testified at trial

about the measurements.  According to Capone, "[b]ased upon the testimony of the paramedic,

Dr. Inguito, Lisa Watson, and the apartment maintenance man, Bernstein and I felt that we had

presented a credible defense of an accidental shooting."

In his answer to Capone's affidavit, Gattis stated under oath that "I have always maintained that the shooting was accidental. I never felt that anyone else had shot the victim--I knew that my own gun had discharged at the time the victim was killed."

On August 24, 1995, Judge Barron denied Gattis's motions for post-conviction relief.

In his amended motion for post-conviction relief, Gattis first claimed the state violated his Sixth and Fourteen Amendment rights by withholding evidence until the penalty phase. Gattis alleged the state withheld a police report following the American Legion shooting, and that this report contains a statement by Slay that Gattis discharged his gun accidentally. Gattis claimed Slay's statement could have been used to buttress his accident defense on the murder charge. Gattis argued his trial counsel was ineffective for failing to raise the issue at trial or on appeal.

Judge Barron ruled this claim was subject to procedural default pursuant to Superior Court Criminal Rule 61(i)(3)[1], because (1) Gattis did not raise the claim at trial or on appeal, and (2) Gattis failed to meet the test set out for ineffective assistance of counsel that is cause for procedural default in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and adopted by the Delaware Supreme Court in <u>Albury v. State</u>, 551 A.2d 53 (Del. 1988). Judge Barron also found this claim failed on the merits because there was no "reasonable probability that the outcome of either phase of Gattis' trial would have been different" and that therefore the evidence was not

---

[1]Rule 61(i)(3) states: "Any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this court, is thereafter barred, unless the movant shows (A) Cause for relief from the procedural default and (B) Prejudice from violation of the movant's rights."

material as required by Brady v. Maryland, 373 U.S. 83 (1967). Gattis III, at *6.

Second, Gattis claimed he was denied his right to a speedy trial in violation of his Fifth Amendment Right to due process and his Fourteenth Amendment right to equal protection because his trial was delayed after his indictment. Gattis was charged by a grand jury on May 23, 1990, and his trial did not commence until September 1, 1992.

Gattis argued he suffered prejudice as a result of the delay "because his penalty was adjudicated by a non-unanimous jury recommendation to the Court" under the amended Delaware death penalty statute. Gattis argued that he would have received a life sentence if he had been sentenced by this jury prior to the change in the law. Gattis argued his trial counsel was ineffective for not pursuing this claim at trial or on appeal.

Judge Barron ruled this claim was subject to procedural default pursuant to Criminal Rule 61(i)(3), because (1) Gattis did not raise it at trial or on appeal, and (2) his claim of ineffective assistance of counsel as cause for procedural default failed to meet the Strickland test. Id. at *7.

Addressing the merits of Gattis's Sixth Amendment claims, Judge Barron found Gattis's counsel had asked for several continuances to arrange for neurological testing, and that these requests caused the trial delays occurring before November 13, 1991. Judge Barron found another period of delay occurred from November 13, 1991 through February 18, 1992. This delay occurred when all capital murder trials were stayed pending the determination of Delaware's new death penalty statute's constitutionality.

Judge Barron ruled Gattis could not attribute to the state the period of delay attributable to defense counsel's requests for continuances to obtain medical testing. Also, Judge Barron concluded that, pursuant to Barker v. Wingo, 407 U.S. 514, 532, Gattis did not suffer cognizable

25

prejudice from the delay pending the determination of Delaware's new death penalty statute's constitutionality.  Gattis III at *8.  Furthermore, Judge Barron concluded, because Gattis participated in the certification process, he effectively waived his right to a speedy trial during the certification period.  Id.

Judge Barron concluded Gattis's equal protection claims did not have merit.  According to the court, "all 'similarly situated defendants' were in fact treated in exactly the same manner as Gattis, and were uniformly made subject to the new law whether or not they participated in the certification process."  Id. at *9.

Third, Gattis raised two claims pertaining to jury selection at his trial.  Gattis alleged he was denied his constitutional rights when "persons with moral scruples against the death penalty were excluded for cause from his jury, making the jury abnormally prone to finding him guilty and denying [his] right to be judged by a fair cross-section of the community."  Gattis also alleged the prosecution intentionally and inappropriately exercised its peremptory challenges in a manner designed to remove "persons with moral scruples" against the death penalty from the jury in violation of the Sixth and Fourteenth Amendments.  In support, Gattis argued that Wilfred Moore is an example of a juror excluded by an improper peremptory strike.

Judge Barron ruled these claims were subject to procedural default pursuant to Criminal Rule 61(i)(3), because (1) Gattis did not raise them at trial or on appeal, and (2) his claim of ineffective assistance of counsel as cause for procedural default failed to meet the Strickland test. Id. at *9.

Judge Barron found Gattis's claim that the jury was abnormally prone to find him guilty, lacked merit.  According to the court, the jurors named by Gattis in his arguments each stated

26

during their individual voir dire examination "in [their] own words that [they] would not

recommend the death penalty even if the facts and circumstances supported such a

recommendation." Judge Barron found, therefore, the exclusions were proper pursuant to

Witherspoon v. Illinois, 391 U.S. 510 (1968). Gattis III at *14. Judge Barron concluded that the

exclusion of any jurors named in his arguments did not deprive Gattis of his constitutional rights.

Judge Barron also ruled Gattis's fair cross-section contention was without merits pursuant

to Lockhart v. McCree, 476 U.S. 167 (1986), which does not prohibit the states from "death

qualifying" juries in capital cases. Gattis III at *15. Furthermore, Judge Barron concluded the

fair cross-section claim is without merit because Gattis made the argument "in relation to his

petit jury rather than the overall jury panel and also since his argument focuses on juror attitudes

rather than on distinctive groups within the community . . . ." Id.

Judge Barron also concluded Gattis's peremptory challenge claim was without merit.

According to the court, Gattis failed to argue the issue with specificity, as required by Criminal

Rule 61. Id. Furthermore, Judge Barron found the state's exercise of peremptory challenge was

not improper, because it was not based upon race or gender. Id. at *16.

Fourth, Gattis claimed he was denied his constitutional right to due process and a fair trial

when the state made prejudicial remarks referring to inadmissible and inflammatory evidence

during its opening statement. Judge Barron noted, this claim is "markedly similar" to a

objections made by trial counsel and raised on appeal. The court concluded it could not

determine whether Gattis intended to repeat these objections, or make new ones.

The court first considered Gattis's claim as if he intended to repeat the same objections

made in his direct appeal. Judge Barron ruled Gattis's current claim, in this case, is barred

because the Delaware Supreme Court had already rejected the claim, see Gattis II, at 818, and that reconsideration under Criminal Rule 61(i)(4) was not warranted. Id.

The court then considered Gattis's claim as if he intended to refer to portions of the state's opening statement not objected to by counsel. Judge Barron concluded, in this case, Gattis failed to sufficiently specify the allegedly objectional remarks or allegedly inadmissible evidence for purposes of Criminal Rule 61. Id. Furthermore, Judge Barron found Gattis was procedurally barred from raising this claim by Criminal Rule 61(i)(3). The court denied Gattis's request to conduct a hearing "to determine the centrality of the issues raised by the inappropriate comments[,]" because the complaint lacked specificity.

Fifth, Gattis claimed his constitutional rights to due process and a fair trial were violated when evidence that was irrelevant and more prejudicial than probative was improperly admitted. Gattis here referred generally to evidence of his alcohol consumption, his infidelity to Slay, prior instances of violence toward Slay and other "bad acts" evidence. Judge Barron concluded that similar issues were resolved on direct appeal, and to that extent, Gattis's claims are barred by Criminal Rule 61(i)(4) because they were already adjudicated. Id. at 17. Furthermore, Judge Barron concluded that Gattis's claims failed because Gattis did not identify newly challenged evidence with specificity.

Sixth, Gattis claimed his constitutional right to due process and a fair trial were violated by the state during its closing remarks when it:

1.      Usurped the jury's role by giving its own opinion of Gattis guilt;
2.      Argued for conviction based on matters irrelevant to the movant's guilt or innocence of the charges; and
3.      Made inflammatory remarks designed solely to make the jury dislike Gattis, rather than to judge the case on the evidence.

28

Judge Barron concluded Gattis failed to allege with sufficient specificity places in the state's closing argument or rebuttal that supported his allegations. Also, Judge Barron concluded the claim was subject to procedural default pursuant to Criminal Rule 61(i)(3), because (1) Gattis did not raise it at trial or on appeal, and (2) Gattis's claim of ineffective assistance of counsel as cause for procedural default failed to meet the Strickland test. Id. Furthermore, the court concluded, "Gattis' allegations are hollow and . . . the prosecutor did not make any of the improper statements suggested by Gattis." Id.

Seventh, Gattis alleged his attorneys rendered constitutionally ineffective assistance at trial because they failed to perform an investigation to develop his version of the events until midway through trial. Gattis claimed his counsel unreasonably and prejudicially failed to:

a. Adequately determine and develop Gattis' version of the facts;
b. Adequately investigate the relevant facts;
c. Interview the relevant witnesses; and
d. Adequately utilize available means of discovering exculpatory evidence available.

Judge Barron concluded the trial performance of Capone and Bernstein was not unreasonable based upon their affidavits. Furthermore, Judge Barron found that Gattis failed to show actual prejudice, as required by Strickland. Id. at *19 (attaching trial counsels' affidavits as Exhibits C and D). According to the court, "Gattis has failed to demonstrate what evidence counsel would have discovered or introduced that would have helped his defense." Id. at *20.

Eighth, Gattis claimed Delaware's death penalty statute violates the Eighth and Fourteenth Amendments.

Gattis argued the death penalty statute fails to instruct the sentencing judge what weight to give the jury recommendation, and therefore results in a pattern of arbitrary and capricious

capital sentencing in violation of the Eighth and Fourteenth Amendments.  Judge Barron ruled

this claim was subject to procedural default pursuant to Criminal Rule 61(i)(3), because (1)

Gattis did not räise it at trial or on appeal, and (2) his claim of ineffective assistance of counsel as

cause for procedural default failed to meet the Strickland test.  Id. at *20.  Also, Judge Barron

ruled this claim failed on the merits because the United States Supreme Court rejected an

identical argument in Harris v. Alabama, -- U.S. --, 115 S. Ct. 1031, 1034 (1995).

Gattis argued the death penalty statute is cruel and unusual punishment in violation of the

Eight Amendment and Article I, Section 11 of the Delaware Constitution, because the lethal

injection method of execution offends evolving standards of decency.  In support of his

contention, Gattis cited the execution procedures adopted by the Delaware Department of

Corrections pursuant to the authority delegated under the statute.  Gattis argued these procedures

are in conflict with the ethical standards of the medical profession because they provide for

physician participation in an execution.

Judge Barron appears to have found this claim was barred by Criminal Rule 61(i)(3).

Also, he ruled that the claim lacks merit because the same contention had been rejected

previously by the Delaware Supreme Court in State v. Deputy, 644 A.2d 411, 421-22 (1994).

Gattis III at *21.

Gattis argued the lethal injection statute is preempted by federal law, and is therefore

unconstitutional because it permits correctional officers to obtain the controlled substances

necessary for an execution without prescription, in violation of the Federal Abuse Prevention and

Control Act, 21 U.S.C. § 801 et. seq., and the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §

353 (b)(1).  Judge Barron rejected this claim because the contention had been rejected

previously by the Delaware Supreme Court in State v. Deputy, 644 A.2d at 417-20. Gattis III at * 21.

Gattis argued the application of a more severe death penalty sentencing law, following the 1991 amendments to 11 Del. C. § 4209, denied him due process and equal protection under the law. Gattis argued this claim is different from the ex post facto issue that he and other defendants raised on certification in State v. Cohen, 604 A.2d 648 (1992), and that he argued on direct appeal.

Judge Barron ruled Gattis was procedurally barred from raising this as a new claim by Criminal Rule 61(i)(3), and that Gattis was procedurally barred from raising this if it were the same as a prior claim by Rule 61(i)(4), which bars reconsideration of formerly adjudicated grounds for relief unless warranted in justice's interest. Substantively, Judge Barron found "the lack of specificity both on the facts and on the law make it impossible to address the merits of this claim, although the Court finds no significant difference in this claim and the ex post facto issues already decided against Gattis and other defendants who have raised the issue." Gattis III at *21.

Gattis argued a death sentence based on a non-unanimous jury recommendation violated the Sixth, Eighth, and Fourteenth Amendments and the Delaware Constitution. Judge Barron declined to address Gattis's Eighth and Fourteenth Amendment contentions, because Gattis "has not explained" them. Judge Barron found the U.S. Constitution does not guarantee a right to be sentenced by a jury, according to Spaziano v. Florida, 468 U.S. 447, 459-60 (1984) and Apodoca v. Oregon, 406 U.S. 404 (1972). Gattis III at *22. Judge Barron also rejected Gattis's argument that a right to a sentencing determination by a jury exists in the Delaware Constitution, pursuant

31

to <u>Cohen v. State</u>, 604 A.2d at 852.  <u>Gattis III</u> at *22.

On August 31, 1995, Gattis filed a motion for reargument, which the court granted in part on the ineffective assistance of counsel issue.  On October 20, 1995, Judge Barron held a hearing to determine whether Gattis's trial counsel provided ineffective assistance by failing to investigate an accidental shooting defense before trial.  Testimony was offered by Slights, Capone, Baumeister, Bernstein, Dewson, and Gattis concerning whether before trial Gattis expressed the belief that he accidentally shot Slay.  Judge Barron found none of the facts adduced at the hearing altered the conclusions he reached previously in denying Gattis's post-conviction motions.  Therefore, Judge Barron denied Gattis's motion for post-conviction relief.  <u>State v. Gattis</u>, Del. Super., Cr.A. No. IN90-05-1017 to 1019-R2; IN90-05-1106; 1107-R2, Barron, J. (Dec. 28, 1995).

Gattis filed an appeal with the Delaware Supreme Court, arguing that a forensic scientist would have testified at trial that the prosecution's theory of the case was "physically impossible" and "absolutely unsupportable."  The Delaware Supreme Court heard oral argument and remanded the matter to the Superior Court to determine whether the state's theory of the homicide was impossible.  <u>Gattis v. State</u>, Del. Supr. No. 37, 1996, Holland, J. (October 15, 1996).  The Delaware Supreme Court also directed the Superior Court to consider on remand whether the state improperly excluded a potential juror, Wilfred Moore, for gender-related reasons.  <u>Id.</u>

Judge Barron ordered Gattis's forensic expert, Stuart James, to provide an additional opinion as to whether the state's theory of the homicide was impossible.  On November 7, 1996,

James submitted an affidavit in which he stated his opinion that "the facts of the case do not support that the shooting occurred in the manner described by the state and adopted by the Court." James declined to frame his opinion in terms of impossibility. Instead, he stated his opinion that the state's version of events is "not plausible to a reasonable degree of scientific certainty based upon the evidence reviewed." He also stated that opinions on forensic matters are rarely formulated in empirical terms such as "impossible."

On December 11, 1996, Judge Barron ruled the state did not improperly excluded Wilfred Moore from the jury based on his gender, and denied Gattis's motion for post-conviction relief on this issue. See State v. Gattis, 1996 WL 769328, Del. Super. No. 90004576DI, Barron J. (Dec. 11, 1996). In denying this motion, Judge Barron found that the prosecution did not exercise its peremptory challenges in a way that discriminated against men. Id. Judge Barron found the state would have challenged Moore in the absence of any gender-related reason because Moore had expressed ambivalence about the death penalty during individual voir dire.

On December 17, 1996, Judge Barron held an evidentiary hearing to determine whether the state's theory of the homicide was impossible, and if, as a result, Gattis's trial counsel provided ineffective assistance by failing to obtain an expert to give an opinion as to the impossibility at trial.

The state presented a video prepared by state prosecutors and county police officers, and testimony that showed that even if Slay's apartment door had been open only twelve to twenty-four inches, Gattis could have seen Slay and entered part of his body into her apartment. Wilmington Police Officer Ronald Webb testified that a person trying to enter Slay's apartment with the door open twelve inches could get his arm into the door and could peer into the

apartment. Sergeant Robert Larrimore testified that when Slay's door was open twelve inches, he was able to get:

> my foot within the wall and the door, and my right arm, shoulder, my right hand was holding my nine millimeter pistol, and my head, approximately a little past the middle of my head could get through the opening. I was not able to see with my left eye unless I tilted my head slightly to the right, and then I could see with both eyes into the room.

Following the hearing, Judge Barron denied Gattis's motion for post-conviction relief based on ineffective assistance of counsel. See Gattis III. In reaching this decision, Judge Barron found that the state's theory was not impossible because Gattis could have reached his head and right arm into Slay's apartment, even if the door were open only twelve inches. Judge Barron concluded "that James's testimony would not have altered the results of the trial." Judge Barron therefore found that Gattis's trial counsel did not offer ineffective assistance by failing to introduce testimony of a forensic expert at trial, because this alleged error did not affect the outcome of the defendant's trial. According to Judge Barron, "Gattis has failed to show that trial counsel's representation fell below an objective standard of reasonableness or that any prejudice resulted from the alleged error of not obtaining a forensic expert such as Mr. James." Id. at *6.

Gattis appealed this decision to the Delaware Supreme Court, which affirmed Judge Barron's decisions to deny post-conviction relief. Gattis IV, as revised on denial of rehearing (Sept. 8, 1997) cert. denied, -- U.S. --, 118 S. Ct. 1070 (1998). On September 19, 1997, Judge Barron rescheduled Gattis's execution for January 9, 1998.

3.       Habeas Petition

On November 25, 1997, Gattis filed a petition for writ of habeas corpus in the United States District Court for the District of Delaware. Gattis also filed various motions, including a

34

motion for a stay of execution, motions to proceed in forma pauperis and for appointment of

counsel, and motions seeking to expand the record and to conduct an evidentiary hearing.  In his

petition, Gattis alleges ten grounds for federal habeas corpus relief.

1. Gattis' constitutional right to a speedy trial was violated when he was not tried for an inordinantly long period of time after indictment, prejudicing his right to a fair trial, in violation of the due process and speedy trial clauses of the Fifth and Fourteenth Amendments.

2. Gattis was denied his right to a trial by a fair and impartial jury of his peers, in violation of his Sixth and Fourteenth Amendment rights under the United States Constitution when the jury selection process was not random.

3. Gattis was denied his right to a trial by a fair and impartial jury of his peers, in violation of his Sixth and Fourteenth Amendment rights under the United States Constitution when the State improperly used a peremptory challenge to exclude a juror based upon that person's gender.

4. Gattis' counsel rendered ineffective assistance at trial, in violation of his Sixth and Fourteenth Amendment rights when they unreasonably and prejudicially failed to properly and adequately prepare for trial.

5. Gattis' counsel rendered ineffective assistance at trial, in violation of his Sixth and Fourteenth Amendment rights when they failed to adequately present defensive evidence and theories of how the homicide actually occurred at trial.

6. As administered in Delaware, and in this particular case, the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution because it is cruel and unusual in that lethal injection offends evolving standards of decency.

7. As administered in Delaware, and in this particular case, the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution because Delaware's lethal injection statute is preempted by federal law and thus is unconstitutional because it permits correctional officers to obtain the controlled substances necessary for the execution, without a prescription, in violation of the Federal Drug Abuse Prevention and Control Act, 21 U.S.C. § 801, et seq., and the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 353(b)(1).

8. As administered in Delaware, and in this particular case, the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution because the application of a more severe death penalty sentencing law (as a result of the 1991

amendments to 11 <u>Del. C.</u> § 4209) which was enacted after the commission of the murder for which Gattis was convicted, denied Gattis due process and equal protection under the law and violated the Ex Post Facto clause of the United States Constitution.

9. Gattis was denied his due process rights during post-conviction proceedings by the Delaware Courts when they limited his right to an evidentiary hearing and expansion of the record, and summarily denied his post-conviction motions.

10. Gattis' due process rights under <u>Dunn v. United States</u>, 442 U.S. 100 (1979) were violated when his conviction and death sentence were affirmed on state post-conviction review on a theory not originally presented to the jury or court that tried and sentenced him.

On December 4, 1997, the court stayed Gattis's execution pending the court's

determination of his habeas petition. On February 13, 1998, Robert Snyder as respondent filed

answers to Gattis's petition for a writ of habeas corpus and motions for leave to conduct an

evidentiary hearing and to expand the record. On March 6, 1998, Gattis submitted a reply to

respondent's answer to his motions to conduct an evidentiary hearing and to expand the record.

On June 10, 1998, this court granted Gattis's motions to proceed in forma pauperis and

for appointment of counsel. The court also granted in part Gattis's motion to expand the record.

The court granted Gattis's request to expand the record (1) by presenting expert opinion in the

form of an affidavit on the propriety of the public defenders' requests for continuances, and the

prejudice Gattis suffered; (2) by presenting expert opinion in the form of an affidavit on the

reasonableness of trial counsel's preparation and presentation; and (3) by presenting statistical

information in the form of documentary evidence about the practical affect of Delaware's 1991

amendment to the state capital punishment statute. The court denied Gattis's motion to hold an

evidentiary hearing.

On July 17, 1998, Gattis filed an opening brief in support of his petition for writ of

habeas corpus.  On October 9, 1998, respondents filed an answer brief.

On December 16, 1998, Gattis filed the affidavit of Thomas J. Saunders, a capital litigation attorney and expert witness.  In his affidavit, Saunders stated he had reviewed Gattis's case for actions or failures of counsel constituting prejudicially deficient performance.  Saunders stated that Gattis's first counsel, Baumeister, failed to object to postponing Gattis's trial even though he was on notice that Senate Bill 79 could impact Gattis's rights.  Saunders stated that Baumeister failed to inform Gattis that changes to the Delaware death penalty statute in Senate Bill 79 could impact his rights after a certain date.  Sanders gave his opinion that these were serious errors "that compromised [Gattis's] right to counsel" and prejudiced Gattis's defense.

II.    DISCUSSION

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996).  The AEDPA amended the standards for reviewing state court judgments in section 2254 proceedings.  Since Gattis filed his habeas petition on November 25, 1997, following the enactment of AEDPA, the court shall apply the amended standards set forth in AEDPA to petitioner's claims for federal habeas corpus relief.  See Lindh v. Murphy, 117 S. Ct. 2059, 2063 (1997).

The Federal habeas corpus statute, 28 U.S.C. § 2254 (1997), provides that a district court will consider a petition for a writ of habeas corpus presented by an individual "in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States."  A district court will not consider a habeas corpus petition unless the petitioner has fulfilled certain procedural requirements, such as

37

having "exhausted the remedies available in the courts of the State." Id. § 2254(b)(1)(A). State remedies are not deemed exhausted if the petitioner "has the right, under the law of the State to raise, by any available procedure, the question presented." Id. § 2254(c). However, a district court may deny the petition on the merits in spite of a petitioner's failure to exhaust the remedies available at the state level. Id. § 2254(b)(2).

The AEDPA increases the deference to be paid by a federal court to the factual findings and legal determinations made by the state courts. See Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996) (finding amended section 2254 to be a "more deferential test" with respect to state courts' legal and factual findings). Amended section 2254(e) provides the factual determinations made by a state court are presumed correct. See 28 U.S.C. § 2254(e)(1). However, amended section 2254(e) goes further, placing on the petitioner the burden of rebutting the presumption by clear and convincing evidence. See id. Also, a district court shall not grant a habeas petition for any claim heard on the merits at the state level unless such previous adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Id. § 2254(d).

A.    Procedurally Barred Claims

The respondent argues that Gattis is procedurally barred from obtaining federal habeas review of several claims. In Coleman v. Thompson, the United States Supreme Court stated that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state of the opportunity to address those claims in the first

instance." Coleman v. Thompson, 501 U.S. 722, 73-32 (1991). Thus, the United States Supreme

Court held, it "will not review a question of federal law decided by a state court if the decision of

that court rests on a state law ground that is independent of the federal question and adequate to

support the judgment." Id. at 729 (citations omitted). In the absence of the independent and

adequate state ground rule, a prisoner could avoid the exhaustion requirement altogether by

defaulting on federal claims in state court because the prisoner technically would have

"exhausted" those claims as state remedies are then no longer available. See id. Accordingly,

the "independent and adequate state ground doctrine ensures that the State's interest in correcting

its own mistakes is respected in all federal habeas cases." Id. at 732.

>1.    What Is The Standard For Determining Whether Gattis's Constitutional
>     Claims Are Procedurally Barred?

Gattis raises several claims that he failed to raise on direct appeal, and that respondent

now argues are procedurally barred. To begin with, Gattis claims that the State failed to disclose

exculpatory evidence that could have been favorable to him during trial, and that this violated his

Sixth Amendment right to effective assistance of counsel and his Fourteenth Amendment right to

due process of the law. Specifically, Gattis claims that by not disclosing in a timely manner a

1987 police report containing a statement made by Slay after Gattis fired his gun at her at the

American Legion Hall, the State violated his Sixth and Fourteenth Amendment rights.

Gattis claims he was denied his Sixth Amendment right to a speedy trial as a result of a

twenty-eight month delay between his arrest and trial. Gattis also raises a claim of constitutional

violation relating to the jury selection. Specifically, Gattis claims he was denied his Sixth and

Fourteenth Amendment rights because the jury selection process was not random.

Gattis also asserts claims regarding the unconstitutionality of the death penalty in Delaware. First, Gattis claims that the Delaware capital sentencing statute unconstitutionally fails to specify the weight that the sentencing judge must give to the jury's recommendation, and therefore is arbitrary. Second, Gattis claims that the death penalty in general and as applied to him, is cruel and unusual punishment in violation of the Eighth Amendment, because the State has "failed to set forth appropriate guidelines for the administration of lethal injection . . . . [and has] fail[ed] to establish sufficient safeguards [to] minimize the problems associated with lethal injection . . . ." Third, Gattis claims that Delaware's lethal injection statute is "preempted by federal law because it permits correctional officers to obtain the controlled substances necessary for the execution, in violation of the Federal Drug Abuse Prevention and Control Act, 21 U.S.C. § 801 et seq., and the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 353(b)(1). Fourth, Gattis claims that the retrospective application of Delaware's revised death penalty statute to crimes committed prior to the enactment of the revised statute violates the constitutional prohibition against ex post facto laws.

Respondent argues that Gattis is prevented from obtaining federal habeas review of the above claims that the state court found were procedurally barred pursuant to Criminal Rule 61(i)(3). See Flamer v. Chaffinch, 827 F. Supp. 1079, 1087-88 (D. Del. 1993) (stating that in "a federal habeas review, a procedural bar requires a finding that the procedural default is based on independent and adequate state grounds," and finding that Criminal Rule 61(i)(3) is an adequate state ground to preclude federal habeas review), aff'd, 68 F.3d 710 (3d Cir. 1995) (en banc), cert. denied, 516 U.S. 1088 (1996). A district court is precluded from considering a procedurally barred claim unless the petitioner can demonstrate (1) both "cause for the default and actual

prejudice as a result of the alleged violation of federal law[;]" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 724 (1991); see also Caswell v. Ryan, 953 F.2d 853, 860-61 (3d Cir.) cert. denied 504 U.S. 944 (1992).

To show "cause" the petitioner must demonstrate "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). If the petitioner is successful in establishing cause, he can demonstrate prejudice by illustrating that "errors at trial . . . worked to [petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 494.

Alternatively, a court can consider an otherwise procedurally barred claim on the merits if a petitioner can demonstrate that failure to do so will effect a "miscarriage of justice." Id. at 496. The exception applies only in "extraordinary cases." Id. To establish a miscarriage of justice, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him. See Schlup v. Delo, 513 U.S. 298, 326 (1995).

Gattis alleges that he has cause for procedurally defaulting on almost all of the above claims because of ineffective assistance of counsel at either the trial level, on appeal, or both. In Strickland v. Washington, the United States Supreme Court articulated a two-part test for evaluating an ineffective assistance of counsel claim. First, a petitioner must demonstrate that counsel's performance at trial or on appeal fell below "an objective standard of reasonableness." Strickland v. Washington, 466 U.S. at 688. In evaluating whether counsel performed reasonably, a court "must be highly deferential." Id. at 689. Therefore, a petitioner "must

41

overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (quotation omitted). Additionally, the Third Circuit has stated that appellate counsel does not have a "duty to raise every possible claim." Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996).

Furthermore in Smith v. Murray, the United States Supreme Court found the standard for finding appellate counsel ineffective more stringent than the standard for finding trial counsel ineffective:

> 'The mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.' Nor can it seriously be maintained that the decision not to press the claim on appeal was an error of such magnitude that it rendered counsel's performance constitutionally deficient under the test of Strickland v. Washington. [However,] 'the right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error . . . if that error is sufficiently egregious and prejudicial.'

Smith v. Murray, 477 U.S. at 535 (quoting Murray v. Carrier, 477 U.S. 478, 486-87 (1986)) (citations omitted). See also id. at 536 (stating that the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy.") (quoting Jones v. Barnes, 463 U.S. 745, 751 (1983)). Thus, Gattis can only prevail on a claim of ineffective assistance of counsel for appellate counsel's failure to raise a particular claim if failing to do so was "sufficiently egregious and prejudicial." Smith v. Murray, 477 U.S. at 535.

Second, a petitioner must illustrate that counsel's ineffective performance caused prejudice. See Strickland, 466 U.S. at 687. The Third Circuit has stated that prejudice occurs where "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." Sistrunk, 96 F.3d at 670 (3d Cir. 1996) (citing

42

Strickland v. Washington, 466 U.S. at 668). The United States Supreme Court has cautioned, however, that when evaluating counsel's performance, a court should not "focus[] solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

As follows, the court examines each of Gattis's claims that respondent argues are barred by procedural default. The court addresses (1) whether Gattis has procedurally defaulted on each of these claims, and (2) whether Gattis has excused his default by reason of cause or fundamental miscarriage of justice. See Coleman v. Thompson, 501 U.S. 722, 724 (1991).

> 2.    Did the State's failure to disclose a police report violate Gattis's
>       constitutional rights?

Gattis appears to claim that the prosecution failed to disclose exculpatory evidence that could have been favorable to him during trial, and that this violated his Sixth Amendment right to effective assistance of counsel and his Fourteenth Amendment right to due process of the law. Specifically, Gattis claims that the prosecution failed to apprize the defense in a timely fashion of a 1987 police report containing a statement by Slay that Gattis discharged his weapon accidentally at the American Legion Hall. According to Gattis, the prosecution used the American Legion incident to bolster its argument that Gattis did not shoot Slay accidentally when he killed her.

Gattis argues that the state courts misapplied federal law under Brady v. Maryland, to reach the conclusion that Gattis's counsel was not ineffective in failing to object to the untimely disclosure of the police report. According to Gattis, the report should have been disclosed "in time for its effective use at trial[,]" citing United States v. Higgs, 713 F.2d 39, 44 (3d Cir. 1983).

43

Gattis argues "[b]ecause there has been a prejudicial <u>Brady</u> violation, the [c]ourt[] should

likewise conclude that the Delaware courts misapplied their <u>Strickland</u> analysis and find that

Gattis's trial and appellate counsel were constitutionally ineffective in failing to object at trial

and to consider the issue on appeal."

Gattis did not raise this claim in his habeas petition. The claim first appears in his

opening brief in support of his petition (D.I. 27). Respondent argues that Gattis has made this

claim too late because he did not include it in his petition. In support, respondent cites

<u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994).

Gattis presented this claim to the state courts, and as a result, he has exhausted state

remedies as to this claim. Gattis failed to raise this claim at trial or on direct appeal. When he

advanced this claim for the first time in post-conviction proceedings, Judge Barron ruled that it

was procedurally barred pursuant to Criminal Rule 61(i)(3). The Delaware Supreme Court

affirmed Judge Barron's ruling. <u>Gattis IV</u>, at 1178. Criminal Rule 61(i)(3) is an adequate state

ground to preclude federal habeas review. <u>See, e.g.</u>, <u>Flamer v. Chaffinch</u>, 827 F. Supp. at 1087-

88. Therefore, unless Gattis establishes cause for and actual prejudice from his state procedural

default, or demonstrates a fundamental miscarriage of justice will occur, this claim must be

dismissed. <u>See, e.g.</u>, <u>Coleman v. Thompson</u>, 501 U.S. at 750-51.

According to the Delaware Supreme Court, "[t]o show actual prejudice, Gattis must show

that there existed a reasonable probability that, but for the counsel's unprofessional errors, the

results of the trial would have been different." <u>Gattis IV</u>, at 1178. The Delaware Supreme Court

found that Judge Barron did not abuse its discretion in rejecting Gattis's contention that there

was a reasonable probability that the outcome of Gattis's trial would have been different if the

prosecution had disclosed the police report earlier. Id. at 1179. Furthermore, the Court found "although the report might have been marginally helpful to the defense if it had been provided earlier, the State's delay did not fall below an objective standard of reasonableness.

In Brady v. Maryland, the United States Supreme Court held that a prosecutor's failure to produce exculpatory or impeachment evidence violates a defendant's constitutional due process rights. See Brady v. Maryland, 787 U.S. at 87 (holding that the failure to produce evidence that is material to either guilt or punishment constitutes a due process violation). The State commits a Brady violation if it suppresses evidence which is favorable to the accused, and is material to either guilt or punishment. See United States v. Bagley, 473 U.S. 667, 674-75 (1985). Favorable evidence includes both exculpatory and impeachment evidence. See id. at 676. Additionally, evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682.

The prosecution did not introduce the police statement in question until the penalty phase of the trial. Because it appears the prosecution delayed disclosure of the police statement to Gattis's trial counsel, the court must determine whether Slay's statement constituted exculpatory or impeachment evidence that might have changed the result of the proceedings.

This court finds that Gattis has not shown that Slay's police statement would have changed the results of the trial. First, the 1987 incident was wholly unrelated to Slay's death. Second, Slay's statement in the 1987 report directly contradicted other statements she made about the same incident. Third, the evidence admitted at trial that Gattis retrieved a gun, borrowed a friend's car, disobeyed a police order to stay away from Slay's apartment, breaking down Slay's door, and shooting Slay between the eyes weighs heavily against any evidence

45

contained in the 1987 police report that the May 9, 1990 shooting was accidental. Fourth, the statement was not really favorable to the defense. Even if Slay did not acknowledge that Gattis intentionally shot a bullet into the floor at her feet, Slay still indicated Gattis retrieved a gun, and discharged the gun during a struggle with William German. Accordingly, this court finds there is not a "reasonable probability" that the result of the trial would have been different.

Therefore, this court finds that Gattis's Brady claim is without merit. Gattis has not presented any evidence demonstrating that the result of the proceedings would have been different if the prosecution had presented Slay's statement earlier. Thus Gattis cannot show that his counsels' failure to object or raise this issue on appeal was either unreasonable or prejudicial. Accordingly, Gattis cannot show cause for failure to object at trial or raise this claim on direct appeal as he has not demonstrated that he received ineffective assistance of counsel.

Gattis has not provided any evidence that failure to consider this claim will result in a fundamental miscarriage of justice. Accordingly, Gattis is barred from raising this claim because he has not shown either cause and prejudice or fundamental miscarriage of justice.

3.    Did trial delays violate Gattis's constitutional rights?

Gattis claims he was denied his Sixth Amendment right to a speedy trial as a result of a twenty-eight month delay between his arrest and his trial. Gattis argues that the delays caused by his first counsel's repeated requests for medical testing were unreasonable and highly prejudicial. Gattis argues the delay caused by the malfeasance of his counsel should not be attributed to him in the court's speedy trial analysis. Gattis alleges "it was [his] desire that his case move forward expeditiously, and ultimately the delays occasioned by the actions of the public defenders appointed to represent [him] resulted in the dissolution of the attorney-client relationship."

46

Gattis presented this claim to the state courts in his post-conviction appeal, and as a result, he has exhausted state remedies as to this claim. Gattis did not raise a speedy trial claim at trial or on direct appeal.

Judge Barron rejected the claim on procedural grounds, holding the claim was barred under Criminal Rule 61(i)(3) because Gattis did not raise the claim on direct appeal, and "because his assertion of counsel's ineffectiveness does not meet the Strickland test." Gattis III, at *6. Judge Barron did not set out his analysis under Strickland.

Criminal Rule 61(i)(3) is an adequate state ground to preclude federal habeas review. See, e.g., Flamer v. Chaffinch, 827 F. Supp. at 1087-88. A district court is precluded from considering a procedurally barred claim unless the petitioner can demonstrate (1) both "cause for the default and actual prejudice as a result of the alleged violation of federal law[;]" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. at 724.

In evaluating whether counsel performed reasonably, a court "must be highly deferential." Strickland v. Washington, 466 U.S. at 689. Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (quotation omitted). Additionally, the Third Circuit has stated that appellate counsel does not have a "duty to raise every possible claim." Sistrunk v. Vaughn, 96 F.3d at 670.

Gattis argues that constitutionally ineffective assistance of counsel constitutes cause for a procedural default in this case, both at trial and on direct appeal. According to Gattis, a speedy trial claim not properly preserved in trial or presented on appeal is reviewable if the failure to

raise the claim "is not merely an error of judgment or a matter of trial strategy," citing <u>People v.</u>
<u>Stanley</u>, 641 N.E.2d 1224 (Ill. App. 1994).

This court finds that Gattis has not presented clear and convincing evidence that his trial
counsel acted unreasonable in failing to object to the trial delays. Gattis's counsel requested the
trial delays in order to have a neurologist test Gattis to ascertain whether Gattis had any
neurological conditions that might bear upon the case. The court finds Gattis has not presented
evidence which overcomes the presumption that the challenged actions by his counsel constituted
sound trial strategy. Also, Gattis has not presented any evidence demonstrating that his appellate
counsel acted unreasonably in failing to raise this issue on appeal.

The Delaware Supreme Court did not address the issue of procedural default, but rejected
Gattis's claim on the merits pursuant to the speedy trial test established by the United States
Supreme Court in <u>Barker v. Wingo</u>, 407 U.S. at 530. <u>Gattis IV</u>, at 1179-80. Because the
Delaware Supreme Court dismissed this claim on the merits, this court addresses the merits of
the claim.

<u>Barker v. Wingo</u> established a four-part analysis for determining whether a defendant has
been denied his right to a speedy trial. <u>See</u> <u>Barker v. Wingo</u>, 407 U.S. at 530. In making this
determination, a court must consider: (1) the length of the delay; (2) the reason for the delay; (3)
the defendant's assertion of his right; and (4) prejudice to the defendant. <u>Id.</u>

According to the Delaware Supreme Court, "delays not attributable to the State should be
subtracted from the time period in question." In support, the Court cited <u>Barker v. Wingo</u>, 407
U.S. at 536, in which the United States Supreme Court stated "we would be reluctant indeed to
rule that a defendant was denied [the right to a speedy trial] on a record that strongly indicates . .

48

. that the defendant did not want a speedy trial." See also Barker v. Wingo, 407 U.S. at 529 ("if the delay is attributable to the defendant then his waiver of [the right to a speedy trial] may be given effect.")

Gattis was arrested on May 10, 1990, and his trial began on September 9, 1992. The Delaware Supreme Court found that a twenty-eight month delay is substantial, but that "the bulk of the delay period was attributed to counsel's requests for continuances to obtain medical evaluations. Without more, we see nothing ineffective about counsel's requested continuances." Gattis IV, at 1180. The Court also found that participation in the certification process related to the constitutionality of Delaware's new death penalty statute caused the final delay, and that Gattis voluntarily participated in this process. Therefore, the Court found, "[Gattis's] claim that he was denied a speedy trial is one of 'self-denial,' in that he voluntarily declined to assert his speedy trial right in the hopes that the certification process would result in an outcome favorable to his case." Finally, the Court found Gattis had not presented any evidence of prejudice.

Pursuant to section 2254(d), this court finds that the Delaware Supreme Court decided this claim based upon clearly established law, and did not act contrary to clearly established federal law when it rejected Gattis's claim that his right to a speedy trial was violated by trial delays. Accordingly, this court finds this claim fails.

    4.    Did the jury selection process violate Gattis's constitutional rights?

Gattis claims he was denied his Sixth and Fourteenth Amendment rights because the jury selection process was not random. Respondents contend Gattis's jury selection process claim is procedurally barred because Gattis presented only state law challenges to the selection process on direct appeal. Respondents argue that on direct appeal Gattis's randomness arguments were

49

"cast solely in terms of state statutory requirements" and that neither the petitioner nor the prosecution made reference to the Sixth Amendment, due process, or equal protection in their briefing on direct appeal. According to respondents, "Gattis . . . did not fairly present any federal claim to the state supreme court in the context of his randomness argument."

Respondents acknowledge that the parties relied on, and the Delaware Supreme Court cited, federal decisional law. But, respondents argue, "reliance on federal cases is not because of any federal constitutional analysis in those decisions, but because the Delaware jury selection statute is modeled on the federal statute (28 U.S.C. §§ 1861-78), making federal decisions interpreting that statute especially relevant."

The United States Supreme Court teaches that to comply with the exhaustion requirement, a habeas petitioner must have "fairly presen[ted]" his federal claims to the state courts. Duncan v. Henry, 513 U.S. 364, 366 (1995). Furthermore, "mere similarity of [state and federal] claims is insufficient to exhaust." Id. The Court of Appeals for the Third Circuit found "[t]his requires that the claim brought in federal court be the substantial equivalent of that presented to the state courts." Lesko v. Owens, 881 F.2d 44, 50 (3d Cir. 1989) cert. denied, 493 U.S. 1036 (1990). "It is not enough for the petitioner to show that he has presented the facts on which the federal claim is based to the state court." Ross v. Petsock, 868 F.2d 639, 641 (3d Cir. 1989). Accordingly, both the legal theory and the facts supporting a federal claim must have been submitted to the state court. See Lesko, 881 F.2d at 50.

Gattis raised a random selection claim on direct appeal to the Delaware Supreme Court. See Gattis II, at 813-817. However, Gattis presented it as a state law issue to be decided pursuant to the Delaware Constitution and the Delaware Jury Act, 10 Del. C. § 4501. In ruling

50

on this claim, the Delaware Supreme Court evaluated it as a claim grounded exclusively in state law. See id. Although the Delaware Supreme Court referred to federal case law interpreting the federal Jury Selection and Service Act, 28 U.S.C. §§ 1861-78, the Court did so because the Delaware Jury Act is modeled on the federal Jury Selection and Service Act.

This court finds that Gattis did not present his federal claims related to jury selection in state court. Even though the state and federal claims are similar, "mere similarity . . . is insufficient to exhaust." Duncan v. Henry, 513 U.S. 366. Accordingly, the court finds Gattis failed to exhaust his state remedies as to his federal claims regarding the randomness of jury selection. However, because Criminal Rule 61(i)(3) forecloses him from seeking post-conviction remedies in the Delaware courts, he is excused from the exhaustion requirement. See Teague v. Lane, 489 U.S. 288, 297-98 (1989) (finding that because "collateral relief would be unavailable to petitioner," "fundamental fairness" requires that the exhaustion requirement be deemed fulfilled). Thus, Gattis is barred from bringing this claim unless he can show cause and prejudice, or that failure to consider the claim will result in a fundamental miscarriage of justice.

Gattis fails to allege either cause for or prejudice resulting from his procedural default. Furthermore, there is no evidence demonstrating that failure to consider this claim will result in a fundamental miscarriage of justice. Accordingly, he is procedurally barred from raising the claim that the State violated his Sixth and Fourteenth Amendment rights because the jury selection process was not random.

        5.       Is the Delaware death penalty statute unconstitutionally arbitrary?

Gattis claims that the Delaware capital sentencing statute unconstitutionally fails to specify the weight that the sentencing judge must give to the jury's recommendation, and

therefore is arbitrary.

Gattis presented this claim to the state courts in his post-conviction appeal, and as a result, he has exhausted state remedies as to this claim. Respondent argues that this claim does not appear in his habeas petition, and therefore is barred, citing Cacoperdo v. Demosthenes, 37 F.3d at 507. Furthermore, Gattis did not raise this issue at trial or on direct appeal. Gattis IV, at 1186. Judge Barron found the claim barred by Criminal Rule 61(i)(3), Gattis III, *21, and also rejected this claim on the merits. The Delaware Supreme Court affirmed Judge Barron's ruling. Gattis IV, at 1186.

Criminal Rule 61(i)(3) is an adequate state ground to preclude federal habeas review. See, e.g., Flamer v. Chaffinch, 827 F. Supp. at 1087-88. Therefore, unless Gattis establishes cause for and actual prejudice from his state procedural default, or demonstrates that a fundamental miscarriage of justice will occur, this claim must be dismissed. See, e.g., Coleman v. Thompson, 501 U.S. at 750-51. Gattis fails to allege either cause for or prejudice resulting from his procedural default. Also, there is no evidence demonstrating that failure to consider this claim will result in a fundamental miscarriage of justice. Accordingly, Gattis is procedurally barred from raising this claim.

Furthermore, in Harris v. Alabama, the United States Supreme Court stated "the Eighth Amendment does not require the State to define the weight the sentencing judge must accord to an advisory jury verdict." Harris v. Alabama, 513 U.S. 504, 515 (1995). Accordingly, Gattis's claim would also fail on substantive grounds. Because this claim would fail on substantive grounds, Gattis cannot argue that his counsels' failure to raise an identical claim was unreasonable or egregious, or caused him prejudice.

Because Gattis has not shown he received ineffective assistance of counsel with respect to this claim, he has not demonstrated cause for not having raised it at his penalty hearing or on direct appeal to the Delaware Supreme Court. Nor has he show that the failure to consider the claim will result in a fundamental miscarriage of justice. Accordingly, this court finds Gattis is procedurally barred from raising this claim challenging the Delaware's death penalty statute.

6.     Is the death penalty cruel and unusual in violation of the Eight Amendment?

Gattis claims that the death penalty in general and as applied to him, is cruel and unusual punishment in violation of the Eighth Amendment, because the State has "failed to set forth appropriate guidelines for the administration of lethal injection . . . . [and has] fail[ed] to establish sufficient safeguards [to] minimize the problems associated with lethal injection . . . ."

Gattis presented this claim to the state courts in his post-conviction appeal, and as a result, he has exhausted state remedies as to this claim. Gattis failed to raise this claim on direct appeal. When he advanced this claim for the first time in post-conviction proceedings, Judge Barron ruled that it was procedurally barred pursuant to Criminal Rule 61(i)(3). Gattis III, at *21. Judge Barron also rejected the claim on the merits. Id. The Delaware Supreme Court rejected the claim on procedural grounds and on the merits. Gattis IV, at 1178. The Delaware Supreme Court found it had already rejected an identical claim on the merits. See State v. Deputy, 644 A.2d 411 (1994). Furthermore, the Court found Gattis had offered no evidence to show that lethal injection is offensive to the "evolving standards of decency that mark the progress of a maturing society." Id. at 421 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).

Criminal Rule 61(i)(3) is an adequate state ground to preclude federal habeas review.

See, e.g., Flamer v. Chaffinch, 827 F. Supp. at 1087-88. Therefore, unless Gattis establishes cause for and actual prejudice from his state procedural default, or demonstrates that a fundamental miscarriage of justice will occur, this claim must be dismissed. See, e.g., Coleman v. Thompson, 501 U.S. at 750-51. Gattis fails to allege either cause for or prejudice resulting from his procedural default. Also, there is no evidence demonstrating that failure to consider this claim will result in a fundamental miscarriage of justice. Accordingly, Gattis is procedurally barred from raising this claim.

Furthermore, this court has previously ruled that Delaware's death penalty statute does not violate the Eighth Amendment's bar against cruel and unusual punishment. Deputy v. Snyder, Civ. Act. No. 94-339-LON, mem. op. at 10-16 (D. Del. June 22, 1994), aff'd, 19 F.3d 1485 (3d Cir.), cert. denied 512 U.S. 1230 (1994); Dawson v. Snyder, 988 F. Supp. 783, 814 (D. Del. 1997). Accordingly, Gattis's claim would also fail on substantive grounds. Because this claim fails on substantive grounds, Gattis cannot argue that his counsels' failure to raise an identical claim was unreasonable or egregious, or caused him prejudice. See Dawson v. Snyder, 988 F. Supp. 783, 814 (D. Del. 1997).

Because Gattis has not shown he received ineffective assistance of counsel with respect to this claim, he has not demonstrated cause for not having raised it at his penalty hearing or on direct appeal to the Delaware Supreme Court. Nor has he show that the failure to consider the claim will result in a fundamental miscarriage of justice. Accordingly, this court finds Gattis is procedurally barred from raising this claim challenging the Delaware's death penalty statute.

       7.     Is Delaware's lethal injection statute preempted by federal law?

Gattis claims that Delaware's lethal injection statute is preempted by federal law because

it permits correctional officers to obtain the controlled substances necessary for the execution, in violation of the Federal Drug Abuse Prevention and Control Act, 21 U.S.C. § 801 et seq., and the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 353(b)(1).

Gattis failed to raise this claim at trial or on direct appeal. Gattis presented this claim to the state courts in his post-conviction appeal, and as a result, he has exhausted state remedies as to this claim. When Gattis advanced this claim for the first time in post-conviction proceedings, Judge Barron ruled that it was procedurally barred pursuant to Criminal Rule 61(i)(3). Gattis III, at *21.

The Delaware Supreme Court rejected the claim on procedural grounds and on the merits. Gattis IV, at 1178. The Delaware Supreme Court found it had already rejected an identical claim on the merits. See State v. Deputy, 644 A.2d 411 (1994). According to the Delaware Supreme Court, in State v. Deputy it held that since the federal government uses the same method of execution that Delaware uses, it would be, at a minimum, incongruous to conclude that Delaware's lethal injection statute violates federal law. See id.

Criminal Rule 61(i)(3) is an adequate state ground to preclude federal habeas review. See, e.g., Flamer v. Chaffinch, 827 F. Supp. at 1087-88. Therefore, unless Gattis establishes cause for and actual prejudice from his state procedural default, or demonstrates that a fundamental miscarriage of justice will occur, this claim must be dismissed. See, e.g., Coleman v. Thompson, 501 U.S. at 750-51. Gattis fails to allege either cause for or prejudice resulting from his procedural defult. Also, there is no evidence demonstrating that failure to consider this claim will result in a fundamental miscarriage of justice. Accordingly, Gattis is procedurally barred from raising this claim.

This court has previously ruled that Delaware's death penalty statute is not preempted by federal law. See Deputy v. Snyder, Civ. Act. No. 94-339-LON, mem. op. at 4-10 (D. Del. June 22, 1994), aff'd 19 F.3d 1485 (3d Cir.), cert. denied, 512 U.S. 1230 (1994). Accordingly, Gattis's claim would also fail on substantive grounds. Because this claim would fail on substantive grounds, Gattis cannot argue that his counsels' failure to raise an identical claim was unreasonable or egregious, or caused him prejudice.

Because Gattis has not shown he received ineffective assistance of counsel with respect to this claim, he has not demonstrated cause for not having raised it at his penalty hearing or on direct appeal to the Delaware Supreme Court. Nor has he show that the failure to consider the claim will result in a fundamental miscarriage of justice. Accordingly, this court finds Gattis is procedurally barred from raising this claim challenging the Delaware's death penalty statute.

B.    Clearly Established Federal Law

Gattis asserts additional claims for which he exhausted state remedies, the determination of which did not rest on independent and adequate state grounds. In Coleman v. Thompson, the United States Supreme Court stated that when considering a habeas petition, "if the decision of the last state court to which the petitioner presented his federal claims . . . did not clearly and adequately rely on an independent and adequate state ground, a federal court may address the petition." Coleman v. Thompson, 501 U.S. at 735. Accordingly, the procedural bar analysis does not apply, and the court may review these claims on their merits.

28 U.S.C. § 2254(d) provides that when evaluating a claim on the merits, a district court must rule against the petitioner, unless he can demonstrate the state court's adjudication of the claim:

56

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d).  Accordingly, the court must determine either whether the state courts decided Gattis's habeas claims on the basis of "clearly established law" and whether the determinations were "contrary to, or involved an unreasonable application of" that law, or whether the decision was based on an "unreasonable determination of the facts."

       1.     <u>What standard of review should the court apply to questions of law and mixed questions of law and fact?</u>

In his habeas petition, Gattis has placed at issue what standard of review the court should apply to federal legal questions and mixed questions of law and fact. Gattis contends that neither the United States Supreme Court nor the Court of Appeals for the Third Circuit has addressed this issue.  <u>See</u> <u>Dickerson v. Vaughn</u>, 90 F.3d 87, 90 (3d Cir. 1996); <u>Berryman v. Morton</u>, 100 F.3d 1089, 1103 (3d Cir. 1996) ("we have not determined the extent of the deference that federal habeas courts must afford to the legal or factual determinations made by state courts.").

Gattis contends that section 2254(d) requires federal courts to conduct a de novo review of federal legal questions and mixed questions of federal law and fact.  According to Gattis, "[t]he only time a federal court is to 'defer' to a state court decision is after careful review, the federal court determines that the state court decision is entitled to respect because it is legally correct."  Gattis bases this argument upon a statement by Senator Orrin Hatch in the legislative history.  According to Gattis, Hatch stated:

[Section 2254(d) contains] a wholly appropriate standard.  It enables the federal court to overturn state court decisions that clearly contravene federal law.  Indeed, this standard

essentially gives the federal court the authority to review, de novo, whether the state court decided the claim in contravention of federal law . . . . It allows the federal courts to review state court decisions that improperly apply clearly established federal law. In other words, if the state court unreasonably applied federal laws, its determination is subject to review by the federal courts . . . .

Liebman & Hertz, <u>Federal Habeas Corpus Practice and Procedure</u>, 2d Ed., 1996 Supp., 244,

<u>citing</u> 142 Cong. Rec. S3446-3447 (April 17, 1996).

According to respondent, section 2254(d)(1) places three limitations upon the availability of federal habeas relief: the writ will not issue unless the petitioner shows that the state court decision "was (1) contrary to or unreasonably applied (2) clearly established federal law (3) as determined by the United States Supreme Court." Respondent contends the phrase "contrary to" refers to the choice of relevant federal law. According to respondent, "[t]he archetype will be the state court's failure to apply the correct legal principle to decide the case." Respondent contends "unreasonable application" refers to the application of the rule to the particular facts. According to respondent, a state court's decision is not unreasonable merely if a federal judge would have reached a different result. "Instead, the state court['] decision must be so obviously wrong, factually or legally, or so arbitrary as to indicate it falls outside the scope of any plausible outcome." Respondent contends the phrase "clearly established Federal law" requires a habeas petitioner to point to extant United States Supreme Court jurisprudence that compels the desired result. According to respondent, section 2254(d) requires the federal court to "first determine if the state court decision was contrary or unreasonably applied Supreme Court precedent. If the decision passes that test, then the petitioner is not entitled to relief."

The court is unpersuaded by Gattis's argument that it should conduct a de novo review of federal legal questions and mixed questions of federal law and fact. Because neither the

Supreme Court nor the Third Circuit have resolved this issue yet, this court looks to other circuits to resolve how to apply the terms "contrary to" and "unreasonable application of" in section 2254(d)(1) of AEDPA. This court finds the approach taken by the United States Court of Appeals for the Fourth Circuit in <u>Green v. French</u> accords the terms at issue their most natural meaning and interprets the statute in a way that is most faithful to the plain purpose of the statute. <u>Green v. French</u>, 143 F.3d 865, 870 (4th Cir. 1998). Accordingly, the court understands that:

> a decision is 'contrary to' precedent only when, either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue. In contrast, a decision represents an 'unreasonable application of' precedent only when that decision applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context for consideration of the principle's applicability).

<u>Green v. French</u>, 143 F.3d 865. The Fourth Circuit offers further clarification:

> If a state court decision is in square conflict with a precedent (supreme court) which is controlling as to law and fact, then the writ of habeas corpus should issue; if no such controlling decision exists, the writ should issue only if the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant supreme court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts. In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable.

<u>Id.</u>

Gattis asserts the following claims which the court may review on the merits. First, Gattis claims the prosecution exercised a peremptory challenge based upon gender in violation of

the Equal Protection Clause of the United States Constitution. Second, Gattis claims his trial

counsel violated his Sixth Amendment right to effective assistance of counsel by failing to

properly adequately prepare for trial. Third, Gattis claims that the retrospective application of

Delaware's revised death penalty statute to crimes committed prior to the enactment of the

revised statute violates the constitutional prohibition against ex post facto laws.

> 1.    Were Gattis's Fourteenth Amendment rights violated when the
> prosecution exercised a peremptory challenge?

Gattis claims the prosecution exercised a peremptory challenge based upon gender which

violates the Equal Protection Clause of the United States Constitution. Respondent contends the

state courts properly rejected this claim based upon the rule of federal law established by the

United States Supreme Court in J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994). See Gattis

IV, at 1183-1185. Gattis presented this claim to the Delaware Supreme Court, thereby

exhausting state remedies. See Gattis IV, at 1184.

Gattis argues that the prosecution used a peremptory challenge to remove Wilfred Moore

from the jury based upon his gender, and that this violated the Equal Protection Clause of the

United States Constitution. During voir dire, the court asked Moore if he could vote to impose

the death penalty. Moore responded "It's like going to war. I don't know if I--you know, until

the time comes, truly in my heart would know if I could bring a bullet up there. I don't know

until the time comes." Moore also stated "I believe in the death penalty, but I don't know if I

could be the one to say, yes, sentence this defendant to death until the time comes." After Judge

Barron questioned Moore on his ability to recommend the death penalty, the prosecutor asked

Judge Barron to strike Moore for cause. The Court refused, and then the prosecution exercised a

peremptory challenge.  The reasons given by the prosecution for excluding Moore were that he

seemed "very conservative in the application of the death penalty" and that he was "an older

gentleman and we have, I believe, four or five older gentlemen on the jury panel already" and

that the State "would prefer to have some more women on the jury."

Gattis cites United States Supreme Court precedent for the proposition that peremptory

challenges may not be utilized to exclude potential jurors for reasons relating to their gender.

See J.E.B. v. Alabama ex. rel T.B., 511 U.S. at 127.

In J.E.B., the United States Supreme Court held that the Equal Protection Clause

prohibits exercising a peremptory challenge to exclude a prospective juror "solely on the basis of

gender[.]"  If, however, a prosecutor exercises a peremptory challenge based on both permissible

and discriminatory reasons,  i.e., mixed motives,  the relevant inquiry is:

> 'whether the party whose conduct is being challenged has demonstrated by a
> preponderance of the evidence that the strike would have nevertheless been exercised
> even if an improper factor had not motivated in part the decision to strike.'  If so, the
> peremptory challenge is not subject to constitutional attack.

United States v. Darden, 70 F.3d 1507, 1531 (8th Cir. 1995), cert. denied 116 U.S. 1449 (1996)

(citations omitted).

Respondent argues that while gender was a factor in the prosecutor's decision to exclude

Moore, the prosecutor also relied on Moore's indecision and reluctance to vote to impose the

death penalty.  According to respondent, the prosecution may strike prospective jurors who show

qualms or ambivalence about their ability to follow the court's instructions in the penalty phase,

citing Brown v. North Carolina, 479 U.S. 940, 941 (1986) (O'Connor, J., concurring in the denial

of certiorari); Brown v. Dixon, 891 F.2d 490, 496-98 (4th Cir. 1989), cert. denied, 506 U.S. 875

(1992).  Respondent points out that before striking Moore, the prosecution had struck four

prospective jurors, including two men and two women, and the jury was composed of four men

and three women.  Respondent points out that after striking Moore, the prosecution struck two

more men and three more women, and the ultimate jury was comprised of six men and six

women.

Judge Barron found that gender was not the prosecution's primary motivation in striking

Moore, and that the prosecution neither harbored nor displayed an intent to discriminate against

men.  Judge Barron found that the State carried its burden of showing it would have challenged

Moore in the absence of a gender-related reason.  See Gattis IV, at 1184.  The Delaware Supreme

Court found no abuse of discretion and affirmed Judge Barron's determination.  Id.  This finding

is presumptively correct unless Gattis can rebut it by clear and convincing evidence. 28 U.S.C. §

2254(e)(1).  Pursuant to J.E.B. v. Alabama, the Delaware Supreme Court found the prosecution

exercised a peremptory challenge in a permissible fashion, because the prosecution proffered a

permissible explanation which was not pretextual.  See Gattis IV, at 1184.

This court finds Gattis has not presented "clear and convincing evidence" to overcome

the presumption of correctness of the state courts' factual findings as required by section

2254(e)(1).  Furthermore, this court finds that the Delaware Supreme Court's rejection of this

claim was not contrary to clearly established federal law, and did not rely on an unreasonable

application of the facts.  Accordingly, this court finds this claim fails pursuant to section 2254(d).

> 2.    Did Gattis receive ineffective assistance of counsel at trial?

In his habeas petition Gattis claims that his trial counsel violated his Sixth Amendment

right to effective assistance of counsel by failing to adequately prepare for trial and by "failing to

adequately present defensive evidence and theories of how the homicide actually occurred at trial." The court finds that these two claims address the same issue, and accordingly, will consider these two claims together as one claim.

Gattis claims his counsel failed to properly and adequately prepare for trial by: (1) failing to adequately determine and develop Gattis's version of the facts; (2) failing to interview the relevant witnesses; (3) failing to adequately utilize means of discovering exculpatory physical and testimonial evidence; (4) failing to make appropriate objections during the course of the trial; and (5) failing to have any unified theory of defense to the charges brought against Gattis. Gattis presented all of these claims to the Delaware Supreme Court, thereby exhausting state remedies. See Gattis IV, at 1184.

The United States Supreme Court stated in Strickland that to prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that counsel's performance fell below an "objective standard of reasonableness," and that counsel's performance caused prejudice. Strickland, 466 U.S. at 687-88.

In Strickland, The United States Supreme Court set out the legal standard for analyzing a claim of ineffective assistance of counsel. See id. However, the determination of whether Gattis received ineffective assistance of counsel is a mixed question of law and fact. See id. at 698. Therefore, this court must analyze whether "an unreasonable application" of clearly established federal law resulted in the Delaware Supreme Court's denial of these claims. See 28 U.S.C. § 2254(d)(1). This court must decide whether the Delaware Supreme Court unreasonably applied Strickland to Gattis's claims that various acts and omissions by Gattis's trial counsel and other counsel constituted ineffective assistance of counsel.

The Delaware Supreme Court found that Gattis's trial counsel's preparation did not fall below a standard of reasonableness, and did not cause Gattis to suffer actual prejudice. Gattis IV, at 1184-85. The Delaware Supreme Court relied on findings of fact made by Judge Barron. To evaluate counsel's pretrial preparation, Judge Barron granted Gattis's request for funds to recreate the crime scene and have the viability of his accident defense evaluated by a forensic consultant, Stuart H. James. James reported that he could not affirmatively say with any scientific certainty that the evidence as recreated weighed in favor of an accident rather than an intentional shooting or that Gattis fired his gun while pushing on the door with his right hand around the door rather than while encountering the victim face-to-face. Judge Barron concluded, and the Delaware Supreme Court affirmed, that even if James had testified at trial, his testimony would not have added weight to Gattis's accident theory of the shooting, and would not have changed the outcome of the trial. Id. at 1184.

Judge Barron also conducted a hearing on the issue of whether the prosecution's theory of the killing was physically impossible. At the hearing, James testified that in his opinion, Slay's apartment door was open no wider than twelve inches, that Slay was standing behind the door when she was shot, and that she fell where she stood. James testified that it was not plausible the door was fully opened when the shot was fired. The Delaware Supreme Court found that the prosecution never argued the door was fully opened when the face-to-face confrontation took place between Gattis and Slay. Id. at 1185. The prosecution's witnesses testified at the hearing that the assailant could have partially entered Slay's apartment even if the door were opened only twelve inches.

The Delaware Supreme Court found that James could not determine to any degree of

64

scientific certainty whether Gattis entered the apartment and shot Slay while standing face to face

with her, or whether he reached his head and right arm through eh door and fired, or whether he

entered the apartment at all. Id. at 1186.

Gattis's trial counsel submitted affidavits to the Superior Court. The Delaware Supreme

Court found the affidavits reflect that counsel took the following actions before and during trial:

> (a) they met with Gattis to discuss trial strategy, including the feasibility of constructing
> and presenting an accidental defense once sufficient facts became known; (b) they
> interviewed neighbors and visited the crime scene, obtaining measurements of the layout
> of the apartment in the area of the apartment door; (c) they considered the need for a
> forensic expert to reconstruct what may have occurred immediately before the shooting
> but ultimately rejected the idea; and (d) they reviewed the physical evidence at police
> headquarters.

Id. at 1185.

Based upon these findings of fact, the Delaware Supreme Court found that Gattis did not

show that his trial counsel's preparation fell below a standard of reasonableness, or that he

suffered actual prejudice. According to the Delaware Supreme Court, Gattis did not shown what

evidence or course of action his attorneys should have presented or undertaken that would have

resulted in a different outcome at trial, and did not show that the expert witness would have

demonstrated that the prosecution's theory of an intentional, face-to-face, execution-style killing

was impossible. According to the Delaware Supreme Court, "Gattis provided no basis for this

Court to find that any lack of preparation by trial counsel caused the jury to reach a verdict it

would not otherwise have reached." Gattis IV, at 1186.

This court finds Gattis has not offered any evidence showing that his trial counsel's

pretrial preparation and trial performance were either unreasonable or egregious, or caused

prejudice. Furthermore, this court finds that the Delaware Supreme Court did not unreasonably

apply clearly established federal law, and did not base its decisions on an unreasonable

application of the facts.  Accordingly, this court finds this claim fails on the merits.

3.    Were Gattis's constitutional rights violated when the court applied
Delaware's revised death penalty statute to crimes committed prior to the
enactment of the revised statute?

Gattis claims that the State of Delaware violated the Ex Post Facto Clause of the United

States Constitution by retroactively applying the terms of Delaware's revised death penalty

statute to crimes committed in 1990, before it was enacted in 1991.  Gattis presented this claim to

the Delaware Supreme Court, and therefore has exhausted state remedies.  See Gattis IV, at

1187-88.

The United States Supreme Court ruled in Gregg v. Georgia, 428 U.S. 153, 207 (1976)

that Georgia's death penalty statute was constitutional.  The Delaware state legislature

subsequently enacted a similar capital punishment regime, codified at 11 Del. C. § 4209.  Under

this statute, the jury was given sentencing authority.  It could sentence a defendant to death

provided that it found, by a unanimous vote, at least one statutory aggravating circumstance

beyond a reasonable doubt, and that it recommended a death sentence after weighing aggravating

and mitigating evidence.  The statute did not require the jury to impose a sentence of death if the

aggravating factors outweighed the mitigating factors.

In October 1991, the Delaware legislature amended the death penalty statute.  The

amended statute was signed into law on November 4, 1991.  The Delaware Supreme Court later

observed that the amending legislation shifted sentencing authority from the jury to the judge:

Under Delaware law, as revised in 1991, a sentence of death may be imposed only under
the bifurcated procedure prescribed by 11 Del. C. § 4209.  That statute requires the jury
to determine, during the penalty phase, 1) whether the evidence shows beyond a

66

> reasonable doubt the existence of at least one statutory aggravating circumstance and 2)
> whether, by a preponderance of the evidence, the aggravating circumstances outweigh
> any mitigating circumstances found to exist. 11 Del. C. § 4209(c). The trial court, after
> considering the recommendation of the jury, is to decide the same questions.
> If the court concludes that the answer to both questions is in the affirmative, it must
> impose a sentence of death; otherwise it must impose a sentence of life imprisonment
> without the possibility of probation, parole, or other reduction in sentence. 11 Del. C. §
> 4209(d). Thus, the Superior Court bears the ultimate responsibility for imposition of the
> death sentence while the jury acts in an advisory capacity as the conscience of the
> community.

Wright v. State, 633 A.2d 329, 335 (Del. 1993) (quotations omitted). Contrary to the original

statute, in which the jury had discretion to impose life imprisonment without parole if the

aggravating factors outweighed mitigating factors, under the revised statute the judge is required

to impose a sentence of death under such circumstances.

Section 6 of the 1991 amending legislation provides that all defendants tried or sentenced

after the effective date of the Act are subject to the new sentencing provisions. Accordingly,

Gattis's 1992 death penalty hearing was conducted pursuant to the terms of the revised death

penalty statute.

Gattis claims that the State of Delaware violated the Ex Post Facto Clause by subjecting

him to the revised sentencing procedures embodied in the amended legislation, as a jury

convicted him of crimes committed before the amended statute's effective date. Gattis argues the

requirement that the judge must sentence him to death if the aggravating factors outweigh the

mitigating factors by a preponderance of the evidence constitutes a retroactive enhancement of

the punishment he originally faced. See Collins v. Youngblood, 497 U.S. 37, 41-44 (1990)

(stating that the Ex Post Facto clause is implicated by "law that changes the punishment and

inflicts a greater punishment, than the law annexed to the crime, when committed.")

The Delaware Supreme Court found the changes to the Delaware death penalty statute procedural. The Court based this upon State v. Cohen, 604 A.2d 846, 852 (1992), in which the Delaware Supreme Court took this issue as a certified question. The Court then relied upon Dobbert v. Florida for the proposition that procedural changes in a law is not ex post facto. Gattis IV, at 1187, note 61, citing Dobbert v. Florida, 432 U.S. 282, 293 (1977).

In Dobbert v. Florida, the United States Supreme Court held that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto." Dobbert v. Florida, 432 U.S. at 293. This court has ruled that the revised Delaware statute does not violate the Ex Post Facto clause because its modifications are procedural in nature. See Ferguson v. Delaware, C.A. No. 96-306-LON, mem. op. at 11-24 (D. Del. 13, 1996) (stating that the revised statute "simply alters the procedures for deciding among the same penalty options," life imprisonment or death).

Although under the current scheme a judge is required to sentence a defendant to death if the aggravating factors outweigh the mitigating factors by a preponderance of the evidence, the statute itself does not mandate an automatic sentence of death for the crime of first degree murder. Thus, even if there is a hypothetical chance that a defendant is more likely to be sentenced to death under the revised Delaware scheme, that factor alone does not violate the Ex Post Facto Clause, because the changes are merely procedural. Accordingly, the court finds that, pursuant to section 2254(d), the Delaware Supreme Court did not act contrary to clearly established federal law when it rejected Gattis's claim that retroactive application of the revised death penalty statute violated the Ex Post Facto Clause.

4.    Did the Superior Court deny Gattis due process of the law when it affirmed his conviction and death sentence on post-conviction review?

Gattis claims his due process rights were violated on post-conviction review because his conviction and sentence were "affirmed on a basis neither set forth in the indictment nor presented to the jury at trial." It appears this claim was presented to the Delaware Supreme Court on appeal from the denial of state post-conviction relief. See Gattis IV, at 1185-86.[2] Thus, Gattis has exhausted state remedies.

Gattis argues that:

the State never intended to portray the Shirley Slay homicide as one where the defendant possibly fished his arm or body around a partially open door and squeezed off the fatal shot during an emotional struggle. Rather this is a revisionist version of the homicide that has been constructed by the State and adopted by the Delaware courts to square with the facts established during the post-conviction process.

According to Gattis, "the cold blooded, execution-style, nature of the offense was extremely important to the jury" in rejecting the accidental shooting theory proposed by Gattis. Gattis also argues "it was significant to the sentencing court in determining that death was the most appropriate penalty to be imposed in this case[,]" citing State v. Gattis, Del. Super., C.A. No. IN90-05-1017 through 1019, 1106, and 1107, Barron, J. (findings After Penalty Hearing) (October 29, 1992).

Gattis relies on Dunn v. United States for the proposition that it is a due process violation to affirm a conviction and sentence on a basis neither set forth in the indictment nor presented to the jury at trial. See Dunn v. United States, 442 U.S. 100 (1979). According to Gattis, in Dunn

---

[2]In the Delaware Supreme Court, Gattis presented this claim as one of ineffective assistance of trial counsel, rather than one of federal due process.

v. United States, the United States Supreme Court held that due process is violated when an

appellate court affirms a conviction on legal and factual grounds not presented to the jury. See

id. at 106.

Respondent argues that Dunn v. United States arose in the context of a direct appeal of

the defendant's conviction. See id. at 103-5. Respondent argues that overturning a conviction on

due process grounds pursuant to Dunn v. United States in the context of federal habeas review

would require the retroactive application of a new rule of federal constitutional law, citing

Teague v. Lane, 489 U.S. at 316 ("habeas corpus cannot be used as a vehicle to create new

constitutional rules of criminal procedure."). Gattis replies that a Dunn due process violation

was recognized by the First Circuit in the context of habeas review in Cola v. Reardon, 787 F.2d

681, 693 (1st Cir. 1986).

This court finds that Gattis's conviction and death sentence are supported by either a

theory that Gattis shot Slay face-to-face at close range, or a theory that he stuck his arm through

the door to shoot Slay at close range. Accordingly, this court finds no merit to Gattis's argument

that his conviction and sentence were "affirmed on a basis neither set forth in the indictment nor

presented to the jury at trial."

Also, the court finds that the state courts did not sustain Gattis's conviction and sentence

on post-conviction review on different facts or a different theory than was presented to the jury.

On post-conviction appeal, the Delaware Supreme Court found:

> Although the State argued that the shooting was intentional and occurred while Gattis and
> [] Slay were face[-]to[-]face, the State never presented testimony from its witnesses nor
> offered any argument by prosecutors asserting that the door was fully open when the
> face-to-face confrontation took place. The State's witnesses testified at the hearing after
> remand that . . . the assailant could have partially entered [ ] Slay's apartment even if the

70

door had opened only twelve inches.

Gattis IV, at 1185-86 (footnotes omitted).  This court presumes these findings of fact to be

correct as Gattis has not presented "clear and convincing evidence" to overcome this

presumption.  28 U.S.C. § 2254(e)(1).  The court finds that the evidence adduced at the

December 1996 hearing did not produce evidence or theories not previously presented to the

jury.  Furthermore, the court finds that, pursuant to § 2254(d), the Delaware Supreme Court did

not act contrary to clearly established federal law when it rejected Gattis's claim.

Furthermore, the court notes that Dunn and Cola both involved a failure to charge the

defendant in the indictment for the specific acts for which he was convicted.  See U.S. v.

Johnson, 804 F.2d 1078, 1084-85 (9th Cir. 1986).  In Dunn, the indictment charged that the

defendant made false statements at a hearing held on a particular date but failed to charge him for

the acts for which he was convicted--making false statements at a hearing on a different date.

Dunn, 442 U.S. at 103-07.  In Cola, the indictment charged the defendant for unlawful

representation because he negotiated certain loans and paid the debts of another but failed to

charge him for the offense for which he was convicted--that he illegally represented another at a

bankruptcy hearing.  Cola, 787 F.2d at 691-93.  Gattis does not allege he was not charged in his

indictment for the specific acts for which he was convicted.

Accordingly, the court rejects Gattis's claim that his constitutional due process rights

were violated because his conviction and sentence were "affirmed on a basis neither set forth in

the indictment nor presented to the jury at trial."

C.    Other Claims

Gattis asserts a claim for which he exhausted state remedies, but which does not fall

71

under the ineffective assistance of counsel analysis. Gattis claims that Judge Barron's limitation of certain rights during post-conviction proceedings violated his right to due process of the law.

1.    Did the denial of discovery and an evidentiary hearing violate Gattis's due process rights?

Gattis claims that he was denied due process of the law during post-conviction proceedings in the Superior Court when Judge Barron "limited his right to an evidentiary hearing and expansion of the record and summarily denied his post-conviction motions." It appears that Gattis raised this claim to the Delaware Supreme Court on his appeal of the denial of state post-conviction relief. See Gattis IV, at 1187-88. Thus, it appears Gattis has exhausted state remedies.

Respondent argues that the state courts provided Gattis ample opportunity "to be heard, to argue, and to present evidence in the post-conviction setting." In support of this, respondent notes that Judge Barron considered Gattis's post-conviction application on a substantially expanded record. Respondent notes that after Gattis filed his motion for state post-conviction relief, Judge Barron granted Gattis's request for funds to employ a crime scene specialist to recreate the crime scene and determine whether Gattis's defense of accident was feasible. According to respondent, Judge Barron received a copy of the expert's report, and also received affidavits from trial counsel and Gattis's responses to the affidavits. Respondent cites the Court of Appeals for the Fifth Circuit for the proposition that state court factual determinations on the basis of affidavits are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). Carter v. Johnson, 110 F.3d 1098, 1106-07 & n. 11 (5th Cir), vacated on other grounds, 118 S. Ct. 409 (1997); Livingston v. Johnson, 107 F.3d 297, 303 (5th Cir.), cert. denied, 118 S. Ct. 204

72

(1997).

Judge Barron denied Gattis's motion as lacking in merit based upon this record. Subsequently, Judge Barron granted Gattis's motion to reargue, and held an evidentiary hearing on October 20, 1995 to address the issue of whether trial counsel were ineffective for failing to conduct an investigation to support Gattis's defense of accidental shooting. According to respondent, six witnesses testified, including Gattis's trial counsel. Following the hearing, the court received memoranda of law from both Gattis and prosecutors. Based on the supplemented record, Judge Barron again rejected Gattis's state post-conviction motion as lacking in merit.

On appeal, the Delaware Supreme Court remanded the case for further proceedings and directed Judge Barron to hold an evidentiary hearing regarding Gattis's claim that the prosecution's theory of the homicide was impossible. On December 17, 1996, Judge Barron conducted a second evidentiary hearing and heard testimony from Gattis's forensic expert. Judge Barron again denied relief, and that decision was affirmed by the Delaware Supreme Court. Gattis IV, at 1184-86.

Claims attacking a state court's application of post-conviction procedures do not state a basis for a federal claim under 28 U.S.C. § 2254. See Steele v. Young, 11 F.3d 1518, 1524 (10th Cir.) (stating that the claim challenging the state post-conviction proceedings "would fail to state a federal constitutional claim cognizable in a federal habeas proceeding"). See also Duff Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir. 1992) cert. denied, 507 U.S. 1056 (1993) (stating that "infirmities in state habeas proceedings do not constitute grounds for federal habeas relief"). Accordingly, this court will not consider Gattis's claim that Judge Barron's limitation of discovery and evidentiary hearing during his post-conviction proceedings violated his right to

73

due process of the law.


III.    <u>CONCLUSION</u>

For the reasons set out above, the court finds that Gattis's claims for habeas corpus relief are procedurally barred, fail on the merits, or should otherwise be denied.  Accordingly, the court will deny Gattis's petition for a writ of habeas corpus.  The court will issue an order in accordance with this opinion.

Copy picked up by:
Kevin O'Connell
Laen Moyers

FILED

MAR 2 5 1999

CLERK, U.S. DISTRICT COURT
DISTRICT OF DELAWARE